Nos. 22-1904, 22-1925

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

OPTIS CELLULAR TECHNOLOGY, LLC, OPTIS WIRELESS TECHNOLOGY, LLC,
PANOPTIS PATENT MANAGEMENT, LLC, UNWIRED PLANET INTERNATIONAL
LIMITED, UNWIRED PLANET, LLC,

*Plaintiffs-Cross-Appellants,*

v.

APPLE INC.,

*Defendants-Appellants.*

Appeal from the United States District Court for the Eastern District of Texas in
Case No. 2:19-cv-00066, Judge J. Rodney Gilstrap

**NON-CONFIDENTIAL OPENING AND RESPONSE BRIEF FOR
PLAINTIFFS-CROSS-APPELLANTS**

William M. Jay
Matthew Ginther
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC  20036
Tel.:  202.346.4000
Fax.:  202.346.4444

Edwina B. Clarke
William Evans
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: 617.570.1000
Fax.: 617.523.1231

Jason C. Sheasby
H. Annita Zhong
Andrew J. Strabone
IRELL & MANELLA LLP
Suite 900
1800 Avenue of the Stars
Los Angeles, CA 90067
Tel.: 310.277.1010
Fax.: 310.203.7199

*Counsel for Cross-Appellants*

February 13, 2023

# PATENT CLAIM AT ISSUE

**Patent No. 9,001,774**

6. A method, comprising:

receiving a processing parameter for transmission of data on two antenna ports, the processing parameter including at least one of a time delay, a phase rotation and a gain determined based on a received uplink signal;

receiving a first pilot, a second pilot, a first data symbol and a second data symbol transmitted on the two antenna ports; and

demodulating the first data symbol and the second data symbol based on the processing parameter, the first pilot and the second pilot.

Appx354-355(10:65-11:8).

# CERTIFICATE OF INTEREST

Undersigned counsel for Cross-Appellants certifies as follows:

1. **The full name of every entity represented by undersigned counsel is:**

   Optis Wireless Technology, LLC; Optis Cellular Technology LLC; PanOptis Patent Management, LLC; Unwired Planet International Limited; Unwired Planet, LLC

2. **The name of the real party in interest for the entities is:**

   N/A

3. **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the entities are:**

   **Optis Wireless Technology, LLC:** Optis WT Holdings, LLC

   **Optis Cellular Technology LLC:** Optis CT Holdings, LLC

   **PanOptis Patent Management, LLC:** PanOptis Equity Holdings, LLC

   **Unwired Planet International Limited:** H57 Acquisition, LLC

   **Unwired Planet, LLC:** Unwired Planet IP Holdings LLC; Unwired Planet IP Manager, LLC

4. **The names of all law firms and the partners or associates that appeared for the entities in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance) are:**

   **McKool Smith, P.C.:** Sam Baxter, Kevin Lee Burgess, Holly Engelmann, Erik Fountain, Mike McKool, Christopher Paul McNett, Steven J. Pollinger, Theodore Stevenson III, Jennifer Truelove, Christine Woodin, Jonathan Yim

   **Gray Reed & McCraw:** Mary Jill Bindler, David DeZern, Jared Hoggan, Eric Tautfest

   **Russ, August, & Kabat:** Seth Hasenour

   **Irell & Manella LLP:** Elliot Z. Chen, Monica Daegele, Lisa Glasser, Ingrid Petersen, Kelsey Schuetz, Crawford Maclain Wells

**5.** **The title and number of any case known to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:**

None.

**6.** **Organizational victims and bankruptcy cases:**

N/A.

/s/ *William M. Jay*
William M. Jay

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................2

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE...............................................................................3

    I.   Apple refuses to license Optis's patented technology, and Optis
        sues Apple for patent infringement. .........................................................3

    II.  A jury finds for Optis. ...............................................................................3

    III. The district court denies Apple a new trial and JMOL on liability. ..............5

    IV. The district court holds a new trial on damages...........................................6

SUMMARY OF ARGUMENT ..............................................................................7

ARGUMENT ......................................................................................................10

STANDARD OF REVIEW .................................................................................10

    I.   The verdict form was not an abuse of discretion. ......................................12

        A. District courts have wide discretion to choose the form of
           verdict. ............................................................................................12

        B. Apple's unanimity argument is waived and meritless. .......................14

    II.  The liability judgment should be affirmed...............................................16

        A. There was sufficient evidence for the jury to find claim 6
           of the '774 patent infringed.............................................................16

        B. Claims 6 and 7 of the '332 patent are patent-eligible and
           infringed. .........................................................................................19

           1.  The district court correctly held that claims 6 and 7
              are patent-eligible.....................................................................19

           2.  There was sufficient evidence for the jury to find
              claims 6 and 7 infringed............................................................22

        C. There was sufficient evidence for the jury to find claims
           1, 14, and 27 of the '284 patent infringed. .......................................24

        D. The district court correctly construed claim 8 of the '833
           patent, and there was sufficient evidence for the jury to
           find the claim infringed. ...................................................................28

            1.  The claim construction is correct.............................................28

      2.  There was sufficient evidence that Apple's products map "row by row."......................................................32

E.  Claim 1 of the '557 patent is not indefinite, and there was sufficient evidence for the jury to find claims 1 and 10 infringed. .........................................................................35

      1.  There was sufficient evidence for the jury to find use of independent claim 10 in the United States................................36

      2.  If the Court reaches claim 1, Apple's indefiniteness and sufficiency arguments fail.....................................................37

            a.  The term "selecting unit" in claim 1 is not indefinite. ........37

            b.  There was sufficient evidence for the jury to find that Apple practices the "select" and "generate" limitations of claim 1. ............................................................41

F.  This Court can affirm the infringement verdict despite any isolated error, because the damages award shows that the jury found *all* claims infringed.............................................44

III.  The original damages verdict was not erroneous and should be reinstated......................................................................53

A.  The district court should have held Apple to its forfeiture. ................53

B.  There was no prejudicial instructional error. .....................................54

C.  No material FRAND evidence was excluded. ....................................57

IV.  Apple has identified no error at the second damages trial that would require vacatur.........................................................60

A.  There is no "disconnect" between the liability verdict and the damages verdict.......................................................................60

B.  The district court did not abuse its discretion in admitting the Apple-Qualcomm agreements........................................................61

C.  References to Apple's profitability were not prejudicial....................65

D.  Apple's objection to the admission of confidential settlement negotiations is waived and meritless.................................................68

CONCLUSION ...............................................................................70

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on page 33 describes confidential source code information. The material omitted in the block quote at the top of page 62 describes confidential information about licenses between Apple and owners of SEP portfolios. The material omitted in the last paragraph of page 62 and page 63 describes a confidential agreement between Apple and Qualcomm. The material omitted on pages 65 and 66 describes a confidential licensing agreement between Optis and a third party.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*In re 3 Star Props., L.L.C.*,
6 F.4th 595 (5th Cir. 2021) ..........................................................................12, 14

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ...........................................................................65

*Alice Corp. Pty Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014)...............................................................................19, 20, 21

*Allied Bank-W., N.A. v. Stein*,
996 F.2d 111 (5th Cir. 1993) ................................................................................12

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ......................................................37, 38, 39, 40

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ..............................................................................63

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) ...........................................................................41

*ATEN Int'l Co. v. Uniclass Tech. Co.*,
932 F.3d 1364 (Fed. Cir. 2019) ...........................................................................27

*Audio Mpeg, Inc. v. Dell, Inc.*,
2017 WL 11682742 (E.D. Va. Oct. 6, 2017).......................................................55

*Avid Tech., Inc. v. Harmonic, Inc.*,
812 F.3d 1040 (Fed. Cir. 2016) ...........................................................................48

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ...........................................................................62

*Braun v. Flynt*,
731 F.2d 1205 (5th Cir. 1984) .............................................................................46

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
838 F.3d 1224 (Fed. Cir. 2016) ...........................................................................11

iv

*DDR Holdings, LLC v. Hotels.com, L.P.*,
 773 F.3d 1245 (Fed. Cir. 2014) ................................................................11, 49

*In re Dossel*,
 115 F.3d 942 (Fed. Cir. 1997) ...............................................................41

*Dupree v. Younger*,
 143 S. Ct. 645 (2023)................................................................20

*Echeverry v. Jazz Casino Co.*,
 988 F.3d 221 (5th Cir. 2021) ...............................................57

*Encompass Office Sols., Inc. v. Louisiana Health Serv. & Indem. Co.*,
 919 F.3d 266 (5th Cir. 2019) ...............................................52

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016) ...........................................21

*Enzo Biochem, Inc. v. Applera Corp.*,
 599 F.3d 1325 (Fed. Cir. 2010) ...........................................18

*ePlus, Inc. v. Lawson Software, Inc.*,
 700 F.3d 509 (Fed. Cir. 2012) .............................................41

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
 955 F.3d 1317 (Fed. Cir. 2020) ....................................*passim*

*Ericsson, Inc. v. D-Link Sys.*,
 773 F.3d 1201 (Fed. Cir. 2014) ...................................48, 49, 55, 57

*Evolved Wireless, LLC v. Apple Inc.*,
 2019 WL 1100471 (D. Del. Mar. 7, 2019) ...........................56

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
 879 F.3d 1332 (Fed. Cir. 2018) ...........................................64

*Fiber, LLC v. Ciena Corp.*,
 792 F. App'x 789 (Fed. Cir. 2019) .......................................41

*Finisar Corp. v. DirecTV Grp., Inc.*,
 523 F.3d 1323 (Fed. Cir. 2008) ...........................................29

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010) ....................................................................33, 36

*Gasoline Prods. Co. v. Champlin Refining Co.*,
283 U.S. 494 (1931).........................................................................................52

*Gillespie v. Sears, Roebuck & Co.*,
386 F.3d 21 (1st Cir. 2004)..............................................................................51

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
339 U.S. 605 (1950).........................................................................................43

*Griffin v. United States*,
502 U.S. 46 (1991)................................................................................49, 50, 51

*Grober v. Mako Prod., Inc.*,
686 F.3d 1335 (Fed. Cir. 2012) .......................................................................35

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
78 F.3d 1575 (Fed. Cir. 1996) .........................................................................12

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
12 F.4th 476 (5th Cir. 2021) ............................................................................55

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) .........................................................................48

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) .......................................................................30

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022) ........................................................................18

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) .......................................................................21

*Kotteakos v. United States*,
328 U.S. 750 (1946).........................................................................................50

*LaserDynamics Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ...........................................................................65

*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004) ...........................................................38, 39

*McDonough Power Equip., Inc. v. Greenwood*,
464 U.S. 548 (1984)...........................................................................45

*Microsoft Corp. v. GeoTag, Inc.*,
817 F.3d 1305 (Fed. Cir. 2016) ........................................................23

*In re MSTG, Inc.*,
675 F.3d 1337 (Fed. Cir. 2012) ........................................................69

*Muth v. Ford Motor Co.*,
461 F.3d 557 (5th Cir. 2006) .......................................................46, 48

*Nester v. Textron, Inc.*,
888 F.3d 151 (5th Cir. 2018) .......................................................47, 50

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
981 F.3d 1015 (Fed. Cir. 2020) ....................................................11, 18

*Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*,
848 F.2d 613 (5th Cir. 1988) ............................................................54

*Northpoint Tech., Ltd. v. MDS America, Inc.*,
413 F.3d 1301 (Fed. Cir. 2005) ....................................................45, 49

*Old Reliable Wholesale, Inc. v. Cornell Corp.*,
635 F.3d 539 (Fed. Cir. 2011) ..........................................................22

*Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*,
885 F.2d 266 (5th Cir. 1989) ............................................................46

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................................................52, 63

*Optis Cellular Tech., LLC v. Apple Retail U.K. Ltd.*,
2022 WL 14915910, EWCA (Civ) 1411 (Eng.)..................................68

*Optis Cellular Tech., LLC v. Kyocera Corp.*,
2017 WL 541298 (E.D. Tex. Feb. 8, 2017)...................................29, 30

*Optis Wireless Tech., LLC v. ZTE Corp.*,
2016 WL 1599478 (E.D. Tex. Apr. 19, 2016)......................................37

*Oracle America, Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014) .......................................................53

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986) .......................................................54

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007) ..................................................43, 44

*Pavo Sols. LLC v. Kingston Tech. Co.*,
35 F.4th 1367 (Fed. Cir. 2022) .......................................................66

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................32

*Prytania Park Hotel v. Gen. Star Indem. Co.*,
179 F.3d 169 (5th Cir. 1999) ..........................................................12

*Railroad Dynamics, Inc. v. A. Stucki Co.*,
727 F.2d 1506 (Fed. Cir. 1984) ......................................................10

*Richard v. Firestone Tire & Rubber Co.*,
853 F.2d 1258 (5th Cir. 1988) ........................................................61

*RLIS, Inc. v. Cerner Corp.*,
128 F. Supp. 3d 963 (S.D. Tex. 2015)..............................................13

*Searcy v. R.J. Reynolds Tobacco Co.*,
902 F.3d 1342 (11th Cir. 2018) ......................................................52

*Structural Rubber Prods. Co. v. Park Rubber Co.*,
749 F.2d 707 (Fed. Cir. 1984) ...................................................12, 13

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004) ..................................................12, 55

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015).......................................................................11

*Texas Advanced Optoelectronic Sols., Inc. v. Renesas Electr. Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018) ...............................................................46

*Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*,
542 F.3d 475 (5th Cir. 2008) ..................................................................11

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011) ...............................................................41

*Ultimatepointer, L.L.C. v. Nintendo Co.*,
2014 WL 12304975 (W.D. Wash. Nov. 19, 2014)....................................67

*Uniloc USA, Inc. v. LG Electrs. USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020) ...............................................................21

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ..........................................................62, 64

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
212 F.3d 1377 (Fed. Cir. 2000) ...............................................................44

*Vermont Indus., Inc. v. Reinke Mfg. Co.*,
983 F.2d 1039 (Fed. Cir. 1993) ...............................................................17

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ..........................................................62, 65

*Walther v. Lone Star Gas Co.*,
952 F.2d 119 (5th Cir. 1992) ...............................................47, 48, 49, 50

*Wellogix, Inc. v. Accenture, LLP*,
716 F.3d 867 (5th Cir. 2013) ..................................................................11

*WickFire, LLC v. Woodruff*,
989 F.3d 343 (5th Cir. 2012) ..................................................................47

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) (en banc) ................................37, 38, 39, 40, 41

*Wilmington Star Mining Co. v. Fulton*,
205 U.S. 60 (1907)............................................................................49, 50

*Z4 Techs, Inc. v. Microsoft Corp.*,
  507 F.3d 1340 (Fed. Cir. 2007) ...........................................................................55

*Zenith Elecs., LLC, v. Sceptre, Inc.*,
  2015 WL 12830689 (C.D. Cal. Feb. 5, 2015) ....................................................56

**Constitution and Statutes:**

U.S. Const. amend. VII ........................................................................................52

28 U.S.C. § 2111 ...................................................................................45, 50, 51

35 U.S.C. § 112, ¶6 ..............................................................................................37

Act of Feb. 26, 1919, ch. 48, 40 Stat. 1181 .......................................................50

**Other Authorities:**

Fed. R. Civ. P. 49 .................................................................................................13

Fed. R. Civ. P. 50 .................................................................................................19

Fed. R. Civ. P. 61 .................................................................................................45

Fed. R. Evid. 408 ...........................................................................................68, 69

Wright & Miller, *Federal Practice and Procedure* § 2501 (3d ed.
  2022) ................................................................................................................13

# GLOSSARY

| | |
|---|---|
| '332 patent | U.S. Patent No. 8,019,332 (Appx265-293) |
| '284 patent | U.S. Patent No. 8,385,284 (Appx294-319) |
| '557 patent | U.S. Patent No. 8,411,557 (Appx320-338) |
| '774 patent | U.S. Patent No. 9,001,774 (Appx339-355) |
| '833 patent | U.S. Patent No. 8,102,833 (Appx356-372) |
| Apple | Defendant-Appellant Apple Inc. |
| DOE | The doctrine of equivalents |
| FRAND | Fair, reasonable, and non-discriminatory |
| Optis | Plaintiffs-Cross-Appellants Optis Cellular Technology, LLC; Optis Wireless Technology, LLC; PanOptis Patent Management, LLC; Unwired Planet International Limited; and Unwired Planet, LLC |
| SEP | Standard-essential patent |

# STATEMENT OF RELATED CASES

No cases are related to these consolidated appeals, as defined by Fed. Cir. R. 47.4(a)(5).  Apple inaccurately cites three prior docket numbers in which this Court summarily dismissed Apple's attempts to appeal the PTAB's non-appealable orders denying institution of inter partes review.  Those appeals were not from the same civil action or proceeding as this one.

**INTRODUCTION**

The jury agreed with Plaintiffs-Cross-Appellants (collectively "Optis") that Apple infringed all five patents-in-suit. That is why the jury awarded exactly the amount of damages Optis requested. Apple insists that it is entitled to a new trial on everything, even if this Court agrees that the jury's verdict rests on sufficient evidence as to some or all of the patents, on the theory that the entire verdict is tainted by a defective verdict form, or perhaps an isolated error as to a single patent.

Apple is incorrect. The district court instructed the jury to reach a unanimous verdict, the verdict form did not undermine that instruction, and every indication is that the jury unanimously sided against Apple—across the board. And none of Apple's granular claims of error justifies reversing the verdict as to even one patent, much less all five.

The district court was, if anything, *too* solicitous of Apple's attacks on the verdict: it granted a completely unnecessary retrial on damages. Apple had agreed (for its own strategic advantage) that evidence regarding FRAND obligations should not be permitted at the first trial. And the district court found that Apple had waived any FRAND-based objection to the damages verdict, for multiple reasons. But the district court then granted Apple a new trial purely because the jury did not hear the word "FRAND." This Court should reinstate the original

1

damages verdict, because there was no basis to second-guess it. If the Court does not reinstate the damages verdict, however, it should affirm the judgment on the jury's second verdict.

## JURISDICTIONAL STATEMENT

Optis agrees with Apple's jurisdictional statement. Optis timely cross-appealed on June 15, 2022. Appx8909-8911.

## STATEMENT OF THE ISSUES

1. Whether the district court's choice of verdict form was an abuse of discretion.

2. a. Whether a reasonable jury could have found that Apple's products infringe the asserted claims.

   b. Whether the district court erred in holding that the asserted claims of the '332 patent are patent-eligible.

   c. Whether the court erred in construing claim 6 of the '833 patent.

   d. Whether the court erred in holding that claim 1 of the '557 patent is not indefinite.

3. On Optis's cross-appeal, whether the district court erred in vacating the original damages award of $506.2 million.

4. If not, whether the damages award at retrial must be vacated due to the form of the liability verdict or the district court's evidentiary decisions.

2

# STATEMENT OF THE CASE

## I. Apple refuses to license Optis's patented technology, and Optis sues Apple for patent infringement.

Optis holds "standard essential patents" ("SEPs") that cover technology necessary for a device to join the 4G cellular network and practice the network's standard, known as "LTE." Optis acquired the asserted patents from LG, Panasonic, and Samsung. Those companies invested enormously in developing LTE-capable technology after recognizing that even small improvements in how data is transmitted would lead to huge efficiencies for users and the network—improvements they patented. Appx1255(255:9-22); Appx1259-1261(259:12-261:24); Appx1265(265:2-9).

Optis engaged Apple in discussions about licensing Optis's technology for Apple's 4G devices. The parties never reached an agreement, but Apple continued to sell its devices, which Apple advertises as LTE-capable. Appx1414(27:7-13). In February 2019, Optis sued Apple, alleging that Apple products capable of implementing the LTE standard, including the iPhone, iPad, and Watch products, infringed Optis's patents. Appx387.

## II. A jury finds for Optis.

The district court held a jury trial in August 2020. Optis asserted nine claims in five patents: claim 6 of the '774 patent; claims 6 and 7 of the '332 patent; claims 1, 14, and 27 of the '284 patent; claim 8 of the '833 patent; and

claims 1 and 10 of the '557 patent.

Both parties proposed asking the jury separate questions about whether Optis had proved infringement of each patent. Appx16315-16316; Appx8264. Apple proposed also requiring the jury to separately decide literal infringement and infringement under the doctrine of equivalents ("DOE"). Appx16315-16316; Appx8264. Although Optis asserted multiple claims of three of the patents, neither party proposed a claim-by-claim verdict. Nor did Apple argue that a patent-by-patent verdict form was necessary to ensure a unanimous verdict.

The district court did not adopt either party's proposal. Instead, it asked the jury, "Did Optis prove by a preponderance of the evidence that Apple infringed ANY of the asserted claims?" Appx101. It asked separate questions about invalidity and willfulness. Appx102-103. Apple objected, "because [the infringement question] does not break out infringement by patent or by literal infringement and infringement under [DOE]." Appx96(948:20-24). Again, Apple did not seek a claim-by-claim breakdown, nor did it argue that the court's question would hinder a unanimous verdict. The court overruled the objection. Appx96(948:25). But it instructed the jury that it should decide the infringement question "claim-by-claim," and that its decision must be unanimous. Appx1187-1188(187:22-188:4); Appx98.

The jury found that Apple infringed, that the infringement was willful, and

that Apple had not proven that any claim was invalid.  Appx101-103.  The jury awarded $506.2 million, as a royalty for past sales.  Appx104.  The award corresponded *exactly* to the sum of the five numbers that Optis's damages expert gave as the measure of damages for each patent, as Apple's counsel acknowledged in closing.  Appx1911-1912(65:13-66:9); Appx2702(1044:20-23).

**III.    The district court denies Apple a new trial and JMOL on liability.**

Apple moved for a new trial, arguing that the verdict form "violated Apple's right to a unanimous verdict" because it did not break down infringement by claim, Appx16075—an argument Apple never made before trial, as Optis pointed out, Appx16132.  The district court rejected that argument, holding that the "jury unanimously answered 'yes'" to the infringement question, and that this answer was consistent with the jury's other responses (*e.g.*, its damages award).  Appx183-185.

Apple also moved for judgment as a matter of law, arguing that the evidence was insufficient to support a finding that Apple's products infringed any of the claims.  The court denied that motion, too, holding that Optis's expert testimony was sufficient for the jury to find that Apple's products infringed all claims, and that the jury could have credited Optis's experts over Apple's experts.  *See* Appx162-173.

## IV. The district court holds a new trial on damages.

The district court granted Apple a new trial on damages, holding that it had erred in excluding evidence of Optis's contractual obligation to license its patents on "fair, reasonable, and non-discriminatory" ("FRAND") terms.

Before the jury trial, the court had barred all mention of the obligation to license patents on FRAND terms. Appx7851-7855. The parties had agreed that the court would decide at a subsequent bench trial whether Optis had complied with its obligation to offer a FRAND-compliant license (and, if so, whether Apple's refusal to accept that license breached its own FRAND obligations).[1] As a result, Apple never sought to introduce evidence of or arguments regarding the parties' FRAND obligations in the first trial. Accordingly, the court did not use the term "FRAND" in its instructions. But the court did instruct the jury to apply apportionment principles consistent with FRAND. It instructed the jury to award an amount that would have resulted from a "reasonabl[e] and voluntar[y]" hypothetical negotiation, that the "patented feature must be apportioned from all the unpatented features," and that "the patent owner's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology." Appx2648-2649(990:2-991:14).

---

[1] While Apple now claims it did not agree to have its own FRAND compliance tried to the court, the two are necessarily linked in the SEP context.

After the bench trial, the district court declined to exercise jurisdiction over Optis's request for a declaratory judgment, concluding that it could not adjudicate FRAND compliance for U.S. patents only. Appx122-124. But the court also found that Apple had waived any FRAND-based objection to the verdict, by maintaining "strategic silence" and not proposing a jury instruction, asserting a defense, or proffering evidence on FRAND obligations. Appx124-127 & n.4.

Apple then reversed course and argued that not telling the jury about FRAND warranted a new trial on damages. Appx141. Without retracting its finding on Apple's waiver, Appx142-144, the district court agreed. It thought "the absence of FRAND evidence and instructions to the jury cast[] serious doubt on the reliability of the verdict." Appx144.

The retrial on damages was held in August 2021. The court instructed the jury "to decide what amount of money damages, if any, to be awarded to the Plaintiffs as compensation for the infringement of their five patents." Appx203. The jury awarded $300 million, as a lump-sum for past and future sales. Appx217-218.

## SUMMARY OF ARGUMENT

I.     The verdict form was not an abuse of discretion. General verdicts are well accepted, and here the district court amply instructed the jury that it must consider infringement claim-by-claim before reaching a unanimous verdict. Apple

7

no longer argues that verdict forms must break out each *claim* separately, and its other objections to the verdict form are waived.

II.  A.  <u>Claim 6, '774 patent</u>:  Apple's challenge is a pure factual dispute about the evidence of infringement.  The jury reasonably credited Optis's expert.

B.  <u>Claims 6 and 7, '332 patent</u>:  Both claims are patent-eligible.  They are not directed to a formula, but use the formula as a particular way of randomizing the UE-specific search spaces, improving over the more battery-intensive prior art and enabling more efficient UE-base station communication.

Both claims are also infringed.  Optis's expert explained why Apple's "shift" operation, recited in the source code, is "one and the same" as the floor(N/L) operation.

C.  <u>Claims 1, 14, and 27, '284 patent</u>:  Apple's challenge is a pure factual dispute about the evidence of infringement.  The jury reasonably credited Optis's expert.  The claims read on the LTE standard, which Apple's devices practice.

D.  <u>Claim 8, '833 patent</u>:  The court correctly rejected Apple's argument that overwriting signals "from" the last row of a matrix means that the overwriting must *begin* in the last row.  As the patent illustrates, the overwriting may occur in multiple, non-contiguous rows, and there is no requirement that it be done back to front (or front to back).

The claim is infringed. The claim reads on the LTE standard, which Apple's devices practice. The jury properly credited Optis's expert testimony that Apple's devices map row-by-row.

E.     Claims 1 and 10, '557 patent: Apple infringes independent claim 10 in the United States. Claim 10 reads on the LTE standard, which Apple's devices practice, and Optis's expert conducted his own testing to confirm domestic infringement. No other argument on this patent implicates claim 10.

Claim 1 is not indefinite, because the term "selecting unit" has sufficient structure. The unit is a circuit, and the claim and specification disclose the "objectives and operations" of the circuit.

Claim 1 is infringed. Apple cannot evade the "selecting" limitation by claiming to select a sequence index and generating the sequence on the fly; the jury was entitled to credit expert testimony that these steps still "select" the sequence. The "generating" limitation reads on the LTE standard, which Apple's devices practice.

F.     Apple wrongly claims that any error, even if confined to a single claim of a single patent, entitles it to a complete retrial on liability *and* damages. That is incorrect. The district court correctly understood the jury as having found that Apple infringed *all* the patents-in-suit, given its verdict awarding Optis exactly

9

the sum of its separate damages requests for all five patents.  As a result, any error affecting only one patent does not affect the finding that Apple infringed others.

III.    On Optis's cross-appeal, the Court should reinstate the original damages judgment.  The district court granted a damages retrial because the jury had not been specifically told about FRAND obligations.  But Apple agreed that FRAND evidence would not come in at trial.  And the jury instructions captured the same concepts even without using the word FRAND.  Indeed, the district court did not even purport to find prejudice and acknowledged that the first verdict may well be FRAND-compliant.  Setting aside that verdict was an abuse of discretion.

IV.    To the extent the retrial verdict stands, Apple identifies no error in it. The jury was properly instructed to assume infringement of all five patents. Apple's objections to particular evidence show neither error nor prejudice:  the district court reasonably deemed the evidence relevant or (in the case of Apple's profitability, which everyone already knew) innocuous.  The jury instructions more than mitigated any conceivable prejudice.

## ARGUMENT

## STANDARD OF REVIEW

The verdict form is reviewed for an abuse of discretion, keeping in mind that "[d]istrict courts have broad authority and discretion in controlling the conduct of a trial," including "the form by which juries return verdicts."  *Railroad Dynamics,*

*Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1515 (Fed. Cir. 1984); *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 489 (5th Cir. 2008).

The district court's claim construction is reviewed de novo, with subsidiary factual findings reviewed for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court's holding that a claim is not indefinite is reviewed de novo, with underlying factual findings reviewed for clear error. *Cox Commc'n, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016). The decision that an invention is patent-eligible is reviewed de novo. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

The district court's decision denying Apple's motion for JMOL on infringement is reviewed de novo. *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1026 (Fed. Cir. 2020). However, the "standard of review with respect to a jury verdict is especially deferential." *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013) (quotations omitted). "In reviewing the record, [the Court] draw[s] all reasonable inferences in favor of the nonmoving party, and … may not make credibility determinations or weigh the evidence." *Id.* (quotations omitted). The Court does not reverse unless "the evidence at trial points so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* (quotations omitted).

With respect to evidentiary decisions, Apple must show that the district court abused its discretion in admitting the evidence and that the outcome would have been different had the evidence been excluded. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363, 1367 (Fed. Cir. 2004).

The district court's decision to grant a new damages trial is reviewed for "an abuse of discretion or a misapprehension of the law," with any legal error reviewed de novo. *Id.* (quoting *Prytania Park Hotel v. Gen. Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999)). The Court "exercise[s] broad review of a court's grant of a new trial because of [its] respect for the jury as an institution and [its] concern that the party who persuaded the jury should not be stripped unfairly of a favorable decision." *Allied Bank-W., N.A. v. Stein*, 996 F.2d 111, 115 (5th Cir. 1993) (citation and quotations omitted).

## I. The verdict form was not an abuse of discretion.

### A. District courts have wide discretion to choose the form of verdict.

Apple's argument (at 10) that the district court's infringement question was per se "improper" is meritless. This Circuit and the Fifth Circuit agree that "[t]he specificity of the verdict is within the discretion of the trial judge." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996); *see In re 3 Star Props., L.L.C.*, 6 F.4th 595, 609-10 (5th Cir. 2021) ("great latitude") (citation omitted); *accord Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707,

720 (Fed. Cir. 1984).  And "[m]ost jury-tried civil cases in federal courts are resolved … by a general verdict in which the jury finds for the plaintiff or for the defendant."  Wright & Miller, *Federal Practice and Procedure* § 2501 (3d ed. 2022).

This broad discretion extends to patent cases.  This Court has said that "a trial court may, with proper instructions, present a patent case to a jury for a general verdict encompassing all of the issues of validity and infringement." *Structural Rubber Prods.*, 749 F.2d at 720 (citation omitted).  The court here separated infringement and invalidity and asked whether "any" claim was infringed, consistent with common practice in that district.  Courts in Texas have also asked juries to decide invalidity in one stroke, even where there are multiple theories of invalidity.  *E.g.*, *RLIS, Inc. v.  Cerner Corp.*, 128 F. Supp. 3d 963, 966 (S.D. Tex. 2015).

The cases on which Apple relies create no entitlement to a more specific verdict form.  In *Zhang v. Am. Gem Seafoods, Inc.*, the court expressly recognized that "some general verdicts are more general than others, *encompassing multiple claims*."  339 F.3d 1020, 1031 (9th Cir. 2003) (emphasis added).  Apple quotes language from the court's analysis of whether the verdicts were general or special under Rule 49, *id.*, a question not relevant here.  And in *Hager v. Gordon*, the jury

was given two pre-set verdict forms to choose between, which improperly did not allow for one of the possible outcomes. 171 F.2d 90, 93 (9th Cir. 1948).

**B.     Apple's unanimity argument is waived and meritless.**

Apple never argued before or during trial that the verdict form would violate its right to juror unanimity; it argued only that a patent-by-patent breakdown would be *clearer*. Appx16315 n.3; Appx8264 n.3; Appx96. And it made a different argument after trial—that preserving unanimity required the verdict form to ask the jury about each *claim*, not each patent. *See* Appx16075. Apple's current unanimity argument is waived.

In any event, Apple completely ignores the jury instructions, contrary to the Fifth Circuit's admonition that verdict forms must be considered "in light of the entire jury instruction." *3 Star*, 2 F.4th at 610 (citation omitted). Here the instructions left no room for the jury to reach a verdict without agreeing on "which individual patents were infringed," as Apple insists. Br. 6.

The jury was instructed that its answers must be unanimous. Appx98; Appx106; Appx2716(1058:19-20); Appx2718(1050:14-16). The jury was also instructed to go "claim-by-claim" and agree as to *which claims* were infringed:

> The first issue that you're asked to decide is whether the Defendant, Apple, has infringed any of the asserted claims of the patents-in-suit. Infringement is assessed on a claim-by-claim basis. And the Plaintiffs, Optis, must show by a preponderance of the evidence that a claim has been infringed. Therefore, there may be infringement as to one claim but no infringement as to another claim.

14

Appx1187-1188(189:22-188:4).  The court gave similar instructions at the end of trial:  "[I]nfringement is assessed on a claim-by-claim basis within each patent. Therefore, there may be infringement of a particular patent as to one claim, even if there is no infringement as to other claims in that patent."  Appx2630-2631(972:22-973:1).

There is only one way to read these instructions:  the jury was required to assess each patent claim individually ("claim-by-claim") and to unanimously agree on *which* claim or claims—if any—were infringed.  Had Apple thought these instructions insufficient, it should have proposed alternatives.

The willfulness question is telling, too.  The jury was asked, "Did Optis prove by a preponderance of the evidence that Apple willfully infringed ANY of the Asserted Claims *that you found were infringed*?"  Appx103 (emphasis added). This question refers back to the specific claims that the jury—a collective *"you*," not "any one of you"—found infringed.

Despite these instructions, Apple claims that *any* disjunctive verdict raises a unanimity problem, but that cannot be squared with its own proposal to ask the jury a single infringement question about each patent, *even the three patents with multiple claims-in-suit*.  Because it did not ask the district court for a claim-by-claim verdict at trial (on infringement *or* invalidity), Appx8264, Appx8266, it is left making a halfhearted unanimity argument that makes no sense.

## II. The liability judgment should be affirmed.

Apple also launches seriatim attacks as to each individual claim-in-suit. Each is without merit (sections A-E, *infra*), and contrary to Apple's incorrect view of harmless error, no one error would justify setting aside the entire verdict (section F, *infra*).

### A. There was sufficient evidence for the jury to find claim 6 of the '774 patent infringed.

The disputed limitation of claim 6 of the '774 patent requires "receiving a processing parameter for transmission of data on two antenna ports, the processing parameter including at least one of a time delay, a phase rotation and a gain determined based on a received uplink signal." Appx354-355(10:65-11:2). As the district court held, Appx165, a jury could have found this limitation infringed based on Dr. Mahon's testimony that Apple's products receive a "DCI format 2" message containing "precoding information" from the base station, and that this precoding information is the processing parameter that "includes the gain and phase rotation information." Appx1447(60:7-16), Appx1448-1449(61:21-62:11); *see also* Appx1444-1453(57:1-66:6) (full analysis); Appx2547-2548(93:3-94:14) (discussing source code); Appx26545-26546 (LTE standard states that "precoding information" is "transmitted" to phone).

Further, Dr. Mahon also explained that "to the extent Apple is correct [that] there's not literal infringement," Apple would infringe under DOE, because

16

receiving the DCI format 2 message "perform[s] substantially the same function" as Apple's construction of "receiving a processing parameter." Appx1519-1520(132:13-133:9). This is because, as Dr. Mahon had previously explained, "the LTE standard is sending a wave using the DCI format 2 … and it's carrying a processing parameter. And you can see the phone ... actually pulls out a gain and a phase rotation based upon what it receives on that DCI format 2." Appx1453(66:11-18). Through the receipt of the information that *includes* gain and phase rotation information, the phone derives a gain and phase rotation. Appx2550(96:1-12). The jury could find this to be substantially the same function ("receiving a processing parameter … including at least one of … a phase rotation and a gain") in substantially the same way ("receipt" of a message sent from the base station to the phone), to obtain substantially the same result ("a phase rotation and a gain"), as the claimed invention. *Vermont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993) (DOE standard); Appx1519-1520(132:13-133:1).[2]

Apple argues that the precoding information does not "include" a gain or phase rotation because its devices "compute[]" those parameters *from* the precoding information. Br. 13-15. But the only "computing" the devices do is to

---

[2] Apple's argument that no reasonable jury could accept this function-way-result analysis collapses into its argument that computation is not the same as receipt. *See* Br. 18-19.

look up the parameters in a codebook index. Appx1450-1451(63:20-64:21); Appx30415. And claim 6 does not restrict *how* the time delay, phase rotation, or gain is "included" with the received processing parameter—*i.e.*, whether look-up is needed to extract the information, or whether the information is simply available. Apple never sought further construction of "include[]," *see* Appx6247-6250, nor did it raise the issue in its requested jury instructions, *see* Appx15954-16006, waiving any argument that those terms should be further limited. *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369-70 (Fed. Cir. 2022).[3]

Apple also asserts, citing nothing, that the codebook index is not "received." Br. 16, 17-18. But it is received: as Dr. Mahon explained, the codebook index is included in the precoding information received in the DCI Format 2 message, and the phone determines the gain and phase rotation information based on that index and tables pre-stored on the phone. *See* Appx1449-1550(62:12-63:11); *see also* Appx1519(132:15-19) (a codebook index is "carried on the DCI format 2 message"); Appx26466 (LTE table showing gain and phase rotation based on codebook index); Appx30411 (demonstrative used by Mahon to explain table).

---

[3] Neither *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015 (Fed. Cir. 2020), nor *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010), on which Apple relies (at 15), involves the question of sufficiency of the evidence on an unconstrued limitation after trial.

**B.      Claims 6 and 7 of the '332 patent are patent-eligible and infringed.**

The asserted claims of the '332 patent (claims 6 and 7) describe a technique a mobile device uses to search for "control information" from the base station. The claims describe a "user equipment" ("UE") for decoding the information comprising a receiver for receiving a Physical Downlink Control Channel ("PDCCH") from a base station and a decoder for decoding PDCCH candidates within a certain space, using a specific randomization formula—a "modulo 'C' operation, wherein 'C' is determined as 'floor (N/L)'"—to determine where the data search should begin. Appx291-292(20:66-21:19).

**1.      The district court correctly held that claims 6 and 7 are patent-eligible.**

The district court correctly held that claims 6 and 7 apply a mathematical concept "to a new and useful end" and thus are patentable. *Alice Corp. Pty Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (quotations omitted); Appx60(98:13-15). Apple's arguments on appeal are meritless.

At the threshold, Apple did not preserve this issue as required by Rule 50 after its summary-judgment motion was denied. Although Apple's preservation appears sufficient under circuit precedent, *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.,* 955 F.3d 1317, 1321 (Fed. Cir. 2020), the Supreme Court will

decide this Term in *Dupree v. Younger*, No. 22-210, whether that precedent is correct.  143 S. Ct. 645 (2023).

Apple argues at *Alice* Step 1 that the invention is the mathematical concept itself.  Not so.  The invention addresses the prior-art problem that a UE had to decode all PDCCH decoding regions in order to find control information intended for it, which was complicated and consumed battery.  Appx283(4:41-42); Appx282(1:58-2:10).  "[T]o limit PDCCH regions to be decoded by each UE," and thus "reduce power consumption," the inventors decided to "set[] a different start position of a search space for each UE in order to transmit and receive control information to and from each UE through a different search space."  Appx282(2:7-10, 18-22).  To maximize the probability of assigning a different start position to each UE, the inventors chose the claimed equation to "impart randomization effects of PDCCH decoding regions between UEs and a base station."  Appx286(10:32-38);  Appx285(8:60-9:4);  Appx291(19:45-48).  The recited equation is therefore a means to achieve the end goal of more efficient UE-base station communication, and not an objective in and of itself.[4]  This distinguishes

_____

[4] Apple barely engages with the specification, focusing instead on a single word ("focus") taken out of context from an expert declaration on infringement and the priority application's note that the invention uses a random number generator.  Br. 22.  The only line Apple cites from the specification is a statement explaining that the purpose of various *embodiments* is to change the start position.  Appx282(10:26-31).  The specification does not state that the purpose of the *invention* is the equation itself.

this case from the cases on which Apple relies (at 22-23). *See, e.g.*, *Uniloc USA, Inc. v. LG Electrs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020) (claims patent-eligible where directed to "a specific asserted improvement to the functionality of the communication system itself"); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) (claims patent-eligible where they recite "specific implementation …. of an existing tool … that improves the functioning of the overall technological process"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) (claims patent-eligible where "directed to a specific improvement to the way computers operate").

If it were necessary to reach *Alice* Step 2, Apple cannot possibly prevail without a remand. The evidence already in the trial record is more than sufficient to show that the claims of the '332 patent were not well-understood, routine, or conventional. Apple relies (at 23) on an out-of-context statement made by the inventor in an email explaining how the invention solved a prior working group proposal. Appx2432-2433(34:11-35:6); Appx1637-1640(437:14-440:3); Appx2436(38:9-12). But Apple made these same arguments in its obviousness case and the jury rejected them, crediting Dr. Madisetti's testimony that the '332 claims provided "a very technical solution to a very technical problem in a very specific application." Appx1552(165:15-16). The USPTO also confirmed the same claims in an ex parte reexamination requested by Apple after the trial,

alleging the same invalidity theories and more. *See* Reexamination Certificate, Appl. No. 90/019,013 (Apr. 8, 2022); *see also Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539, 549 (Fed. Cir. 2011) (judicial notice of reexamination proceedings). If the Court does not simply affirm, at a minimum a remand on Step 2 would be needed.

### 2. There was sufficient evidence for the jury to find claims 6 and 7 infringed.

There was sufficient evidence for the jury to find that Apple's products use the "floor(N/L)" operation, involving a "divide" operation. Br. 24-25. First, Dr. Madisetti testified that the LTE standard recites the floor(N/L) operation and that the accused products practice the standard. Appx1553-1554(166:1-167:21); Appx1558-1559(171:1-172:15); *see also* Appx30318 (TS 36.213, Section 9.1.1); Appx26664. This evidence was sufficient standing alone, and Apple does not engage with it.

Second, looking at the source code itself, Dr. Madisetti showed how the code recites the limitations in the claims. Appx26665-26666; Appx1559-1565(172:15-178:7). As Apple concedes, he testified that Apple's "shift" operation, recited in the source code, "implements," "perform[s]," and "carrie[s] out" the floor(N/L) operation. Br. 24 (citing transcript). Apple says this is not the same as *using* the floor(N/L) calculation. But Dr. Madisetti testified that the two operations are "one and the same," and not just different ways of reaching the same

result.   Appx1649(449:8-9);   Appx1648   (448:3-6);   *see   also*   Appx1642-1643(442:25-443:2) (the "right shift" is "also divide"); Appx1645-1646(445:17-446:6) (agreeing he had "taken the position in this case that a shift is the same thing as a floor(N/L) operation"); Appx1674(474:14-24) (code uses divide and shift the same way, "a standard way," "a very common way of doing arithmetic"); Appx2510(56:14-15) (the shift "appears here, as a part of the floor—the N/L operation here"); Appx2511(57:6-13) ("the slash operation can be met by a shift operation, shift to the right").

Apple's expert, Mr. Lanning, conceded that a shift is a divide. Appx2448-2449(50:24-51:2) (agreeing that "a shift can satisfy the claimed divide function" and that "shift instructions are commonly used to multiply or divide"). That admission is a complete response to Apple's insistence that the claim must read on the device exactly:  Dr. Madisetti pointed to an operation that he testified *is* "one and the same" as the claimed operation.  Appx1649(449:8-9).  He was not arguing that the two operations simply produce the same results, as in cases like *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313-15 (Fed. Cir. 2016).

On appeal, Apple focuses on its expert's testimony that the divide was more efficient, Appx2428-2432(30:17-34:10), but he acknowledged that he had not run a simulation to confirm that opinion, Appx2447-2448(49:22-50:16).  The jury was well within its rights to credit Dr. Madisetti's testimony over Mr. Lanning's.

**C.    There was sufficient evidence for the jury to find claims 1, 14, and 27 of the '284 patent infringed.**

The '284 patent describes a control-information field that jointly encodes two parameters, thereby using less bandwidth than if they were conveyed separately. Appx1402-1406(15:7-19:18). The parameters are a "transport format" parameter telling the mobile device how the data is assembled and a "redundancy version" parameter telling the device how to correct errors. Appx1402(15:15-24). The three asserted claims require a control-information field "wherein a first subset of values is *reserved for indicating* the transport format," "a second subset of the values … is *reserved for indicating* the redundancy version," and "the first subset of the values contains more values than the second subset of the values." *E.g.*, Appx317-318(28:65-29:4) (emphasis added). Apple does not challenge the district court's ruling that it is for the jury to decide which values are "reserved for indicating" the recited parameters. Appx33. Both parties presented testimony on this disputed fact question, and the district court correctly held that Dr. Mahon's testimony was sufficient for the jury to find infringement. *See* Appx171-172.

Apple does not dispute that its products follow the LTE standard, so Dr. Mahon compared that standard (on the right) to Table 3 from the patent (on the left):

24



Appx30353. Dr. Mahon testified that the term "first subset" in the claims-in-suit refers to the green highlighted values, which are "reserved for" transport format ("TF" and "TBS Index"), as indicated by the fact that, in Table 3, that area of the chart is labeled with "TF Range." Appx1417(30:10-13); Appx1421(34:10-16); Appx1511(124:3-6). Both charts show an "RV" value of 0 for this first subset. Dr. Mahon explained that the "second subset" refers to the orange highlighted values, which are "reserved for" the redundancy value, as indicated by the "RV Range" label in Table 3, the change in the RV values (from 0 to 1, 2, 3) and the "reserved" label in the standard. Appx1417(30:15-17); Appx1421(34:10-16); Appx1511(124:7-12). To support his opinion, Dr. Mahon cited statements the inventors made to the USPTO, where they explained that "TF Range" in Table 3 corresponds to "a first subset of values" in the claims, and "RV Range" in Table 3

corresponds to the "second subset" of values in the claims. Appx1421-1422(34:24-35:11); Appx30365; Appx25857. Because, for the standard, the number of rows of values in the green highlighted area is greater than the number of rows of values in the orange highlighted area, Dr. Mahon concluded that Apple's products infringe. Appx1420-1421(33:9-34:23).[5]

The jury credited Dr. Mahon's testimony over that of Apple's expert, Dr. Buehrer—and with good reason. Dr. Buehrer claimed that, in the standard, the "first subset" referred to the entire column under "TBS Index"; the "second subset" referred to the entire column under "Redundancy Version"; and, therefore, there were more values in the second subset than the first. Appx2070-2080(723:14-733:14). But as Dr. Mahon explained and as Dr. Buehrer acknowledged, Dr. Buehrer's analysis would mean that Tables 3-8 in the patent are outside the claims. Appx2555-2556(101:2-102:10); *see also* Appx2104(757:2-4); Appx2106-2107(759:18-760:17). Dr. Buehrer acknowledged that he didn't "identify one single table or figure in the patent that depicts [his] interpretations." Appx2107(760:14-17).

Apple has forfeited the argument that Dr. Mahon "argue[d] a new claim construction to the jury" (Br. 28-29). Apple never objected to his testimony on this

---

[5] Apple spuriously claims (at 28) that Dr. Mahon made an "admi[ssion]" helpful to Apple. Dr. Mahon merely acknowledged Apple's expert's testimony; he was clear that he disagreed with what the testimony meant in terms of infringement. *See* Appx1514-1517(127:23-130:15).

ground, including when he introduced evidence of the specification and prosecution history. *See generally* Appx1402-1425; *see also ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1370 (Fed. Cir. 2019) (failure to object waived challenge to claim-construction testimony).[6] In fact, Apple itself argued that "the prosecution history should be fair game," Appx2109(762:14-17), and sought to cross-examine Dr. Mahon on it, Appx1506-1507(119:8-120:18).

Regardless, Dr. Mahon did not propose a claim construction incorporating the concept of a "changing" redundancy value. He merely pointed to the difference in the redundancy value of "0" in the first section of the charts and the redundancy values of "1, 2, 3" in the second section as evidence of the dividing line between two subsets. Appx1417(30:14-17). And he referenced *Apple's expert's* testimony that "there is a first set and a second set, and … that the redundancy value *changes* in the second set" to support his conclusion that the "first subset" is the set where the RV values are all 0, and the "second subset" is the set where the RV values change. Appx2553-2555(99:2-101:17) (emphasis added).

---

[6] The objection that Apple cites (at 29) was to a *different* aspect of Dr. Mahon's testimony, later at trial. When rebutting Dr. Buehrer's testimony, Dr. Mahon noted Dr. Buehrer admitted that his interpretation of the claim language was inconsistent with the specification's tables. Appx2555-2557(101:2-103:31). Apple objected, unsuccessfully, that, by referencing the tables, Dr. Mahon "is asking the jury to do claim construction." Appx2557(103:3-6).

**D. The district court correctly construed claim 8 of the '833 patent, and there was sufficient evidence for the jury to find the claim infringed.**

Apple's proposed construction of the '833 patent is inconsistent with the claim's text. Optis's expert testimony was sufficient for a jury to find that Apple's products map "row-by-row" as opposed to "column-by-column." The jury was not required to credit Apple's experts' opposing view.

**1. The claim construction is correct.**

The '833 patent is directed to technology for transmitting "uplink control signals" from the mobile device to the base station to report whether the device received the base station's prior communication and how to communicate with the device. Claim 8 describes a mobile station that "multiplexes" two types of signals—"control" and "data" signals—and then maps them to a "2-dimensional resource matrix" for transmission. Appx371(9:65-10:31). The signals are mapped across the rows (as opposed to down the columns), and then the station overwrites some of the mapped control and data signals with "ACK" and "NACK" signals. Appx367(12:23-31). The parties disputed the claim's description of the last step. Claim 8 recites:

> A mobile station for transmitting uplink signals comprising control signals and data signals in a wireless communication system, the mobile station comprising:
>
> a processor serially multiplexing first control signals and data signals …;

the processor mapping the multiplexed signals to a 2-dimensional resource matrix … wherein the multiplexed signals are mapped from the first column of the first row to the last column of the first row, the first column of the second row to the last column of the second row, and so on, until all the multiplexed signals are mapped to the 2-dimensional resource matrix; and

the processor mapping ACK/NACK control signals to specific columns of the 2-dimensional resource matrix, wherein the specific columns correspond to SC-FDMA symbols right adjacent to the specific SC-FDMA symbols, ***wherein the ACK/NACK control signals overwrite some of the multiplexed signals mapped to the 2-dimensional  resource matrix from the last row of the specific columns***.

Appx371(9:65-10:31) (emphasis added).  Adopting its construction of the same language in an earlier case, the district court held that the bolded language does not require that the overwriting *start* in the last row of the 2-dimensional resource matrix, but only that the ACK/NACK control signals overwrite "some" signals that are "from" the last row.  Appx50-53 (citing *Optis Cellular Tech., LLC v. Kyocera Corp.*, 2017 WL 541298, *19 (E.D. Tex. Feb. 8, 2017)); *see also Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent").

Apple's construction—that "from" means "beginning from"—makes no sense in light of other language in the claim.  The previous method step states that "the multiplexed signals are mapped *from* the first column of the first row *to* the last column of the first row."  Appx371(10:17-19).  That is how the drafters specified a precise mapping sequence from beginning to end.  In the step at issue here, by contrast, "from" is used differently:  the claim states only that the

ACK/NACK control signals overwrite signals "from" the last row of the specific column of the matrix, not "from" one location "to" another. The use of "different terms" in the same claim "reflect[s] a differentiation in the meaning of those terms." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004); *see Optis*, 2019 WL 541298, at *19; Appx5357-5358(¶¶48-51) (Optis's expert).

The court's construction is also supported by Figure 6, which shows ACK/NACK symbols in the third row and the final row, but does not *require* the ACK/NACK symbols to be mapped *first* in the final row, and *then* in the third row:



30

Appx363; *see also* Appx26690 (demonstrative showing figure 6). Neither the figure nor the description of the figure in the patent, *see* Appx369-370(6:49-7:14), specifies in what order the mapping should occur—whether row 3 first, last row first, simultaneously, or alternating.

Apple counters that the patentees would have written "in," not "from," had they intended the court's construction. But the words mean the same thing in this context (*e.g.*, "she chose three people *from/in* the third row to come up on stage"). It is Apple's construction that requires alternative wording: it effectively adds "beginning" before "from" to indicate a starting point, given that "from" is not paired with "to." Appx6251; *see also* Appx5357-5358(¶¶48-51).

Apple's prosecution-history argument is flawed. The applicants explained that by having ACK/NACK signals overwrite signals "from the last row," the claim "can *reduce the probability that the first control signals are overwritten by the ACK/NACK signals*." Appx7358 (emphasis added). From this, Apple argues (at 35) that the overwriting must start at the last row and work its way back toward the first row. But the applicants' goal of *reducing* the chance of overwriting first control signals is achieved by having *some* ACK/NACK signals go in the last row. Even on Apple's view, those signals are not *confined* to the last row, or rows adjacent to it. Figure 6 confirms that none of the first control signals (seen in rows

1-2) is overwritten by the ACK/NACK signals (seen in rows 3 and 12), and it does not matter whether the overwriting in row 3 or 12 occurs first. Apple's expert may have insisted that starting in the last row is the "best way" of achieving that goal (Br. 35), but the claim language is not limited to that supposedly superior embodiment. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) (a court should "discount any expert testimony that is clearly at odds with the claim construction mandated by the claims itself") (quotations omitted).

### 2. There was sufficient evidence that Apple's products map "row by row."

Claim 8 requires that the multiplexed data and control signals be mapped sequentially across rows, as opposed to down columns. The district court correctly held that Dr. Madisetti's testimony was sufficient for a jury to find that Apple's products map across rows. *See* Appx169-170.

First, Dr. Madisetti testified that the LTE standard requires row-by-row mapping, and that Apple practices that standard. He explained that the standard discloses a mapping that "starts with the first row, first column of the first row and ends with the last column of the first row. So within a row, the mapping is from column to column, and for the entire map, it is mapped row-by-row."

Appx1575(188:16-20).[7]   Contrary to Apple's argument (at 37), Dr. Madisetti grounded his testimony in the standard:  he testified that the standard uses the term "shall" in reference to the mapping order, and "shall means it must." Appx1834(32:1-12) (citing PTX-2142); *see also* Appx26527-26528 (PTX-2142) ("[t]he control information and the data *shall* be multiplexed as follows") (emphasis added).  Dr. Madisetti also testified that "the LTE standard … is used by Apple."  Appx1575(188:3-4); Appx1575(188:24-25) (similar).  The fact that the claims "include[] any device that practices [the] standard" is alone "sufficient for a finding of infringement."  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327 (Fed. Cir. 2010).

Second, Dr. Madisetti also examined the source code from Intel and Qualcomm, the companies from whom Apple receives control processors, and testified that, based on his review of the source code, the processors map row-by-row.  He read the relevant exhibit as indicating that ▮value▮ is mapped before "data," with ▮value▮ filling a row before moving to the next.  *See* Appx26713.  Dr. Madisetti testified that the code indicated that the mapping is done across rows.

---

[7] Dr. Madisetti never said that Apple's products do not infringe. *See* Br. 37. As he explained, when he used the term "column-by-column" in his deposition, he meant the mapping happens "column-by-column across th[e] row." Appx1679(479:12-24). "So overall, the map—the matrix—2D matrix is mapped row-by-row, but within each row, it is column-by-column." Appx1679-1680(479:25-480:2).

Appx1576-1577(189:17-190:3). The Intel exhibits showed that Intel's source code listed "row" before "column." Appx26714; *see also* Appx30070. Dr. Madisetti concluded that the Intel products also map across rows. Appx1577-1578(190:12-191:12). Apple's argument (at 38) that the trial evidence did not show the order of mapping ignores Dr. Madisetti's analysis.

Apple argues that this testimony should all be discounted because Dr. Madisetti's analysis of Qualcomm's source code includes a reference to a "programmer comment." Br. 38. But although not functional, a programmer's comment is relevant to *understanding* the code as a whole. *See* Appx2547-2546(93:23-94:3). Moreover, Apple identifies just one allegedly immaterial line among many lines of code on Dr. Madisetti's demonstrative, hardly undercutting the entire slide or testimony.

Apple also points to the testimony of its witnesses, who disagreed with Dr. Madisetti. Br. 36. But it was the jury's decision to credit Dr. Madisetti over Dr. Wells, and it credited Dr. Madisetti for good reason. Dr. Madisetti explained that Apple's expert, Dr. Wells, confused the transmission step with the mapping step, and that he was erroneously "pointing to" the former when he described column-by-column mapping. Appx2520-2524(66:17-70:10). Apple asserts, with no explanation, that Dr. Wells was "clearly referring to the mapping step." Br. 37 (citing Appx2305-2311). Nothing about this is clear from the transcript, which

does not indicate what Dr. Wells was "pointing to" on his hand-drawn diagram when he described column-by-column mapping. *See* Appx2304-2311(819:16-826:10); *see also* Appx2522-2523(68:10-69:6) (Dr. Madisetti saying Dr. Wells was "pointing to the wrong part of this diagram"). The jury saw Dr. Wells's gesture in person, and apparently credited Dr. Madisetti's explanation for the error.

### E. Claim 1 of the '557 patent is not indefinite, and there was sufficient evidence for the jury to find claims 1 and 10 infringed.

The '557 patent is directed to technology for allowing a mobile device to report control information to the base station using a Random Access Channel ("RACH"). The RACH signal is a series of code sequences sent to the base station that act as a "signature" that distinguishes the sending mobile device from other mobile devices also sending RACH signals. Appx39. The invention of the '557 patent is to allow mobile devices to more efficiently report selected signatures by establishing certain associations between code sequences and the grouping of signatures, based on control information received from a base station. Appx40. Optis asserted independent claims 1 and 10; if the Court rejects Apple's cursory sufficiency-of-evidence challenge on claim 10, it need not reach Apple's arguments on claim 1, which would not affect the outcome. *See Grober v. Mako Prod., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012) ("[A] patent is infringed if a single claim is infringed.").

**1. There was sufficient evidence for the jury to find use of independent claim 10 in the United States.**

There were two independent bases on which the jury could have found that Apple infringed claim 10 in the United States.

First, Apple tested the LTE standard domestically, and the standard requires claim 10's method. Apple concedes the former point, disputing only the latter. But the jury permissibly resolved that dispute against Apple. Dr. Madisetti testified that the LTE standard "practices the claims at issue of the … '557 patent[], because of the use of the word 'shall'" in the relevant portion of the standard. Appx1833-1834(31:10-32:17). He also testified that the standards "explicitly disclosed that there are multiple groups, Group A and Group B, and you select preamble or sequence from the selected group." Appx1816(14:13-22); *accord* Appx1820-1821(18:21-19:12); Appx1826(24:5-25). Apple interprets the standard differently, but cites no supporting testimony. Practicing the standard claimed by the patent is alone sufficient to find infringement. *Fujitsu*, 620 F.3d at 1327.

Second, Dr. Madisetti testified that his own tests monitoring the activity of iPhones in the United States found infringement of claim 10—including the plurality-of-groups requirement. Appx1830-1832(28:17-30:11); *accord* Appx1827-1829(25:15-27:14). This, too, was more than sufficient for the jury's domestic-infringement finding—and to find the '557 patent infringed.

36

**2.** **If the Court reaches claim 1, Apple's indefiniteness and sufficiency arguments fail.**

Finding claim 10 infringed is sufficient to sustain the judgment with respect to the '557 patent. But Apple identifies no error with respect to claim 1 either.

> *a.* *The term "selecting unit" in claim 1 is not indefinite.*

The district court correctly held, incorporating its earlier decision on the identical issue, that the "selecting unit" term in claim 1 of the '557 patent is not subject to 35 U.S.C. § 112, ¶6. *See* Appx44-46 (citing *Optis Wireless Tech., LLC v. ZTE Corp.*, 2016 WL 1599478, at *40-41 (E.D. Tex. Apr. 19, 2016)). The term does not include the word "means"; therefore, the Court presumes that ¶6 does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-49 (Fed. Cir. 2015) (en banc). To overcome this presumption, Apple must demonstrate that the term "selecting unit" "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (quotations omitted). Apple has not done so.

The claim language supplies structure. "Structure may … be provided by describing the claim limitation's operation, such as its input, output, or connections." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2014), *overruled on other grounds by Williamson*, 792 F.3d at 1349. The claim here does just that. It specifies that the selecting unit "select[s] a sequence" (the output) by "randomly" choosing from a "plurality of sequences" contained "in one group of a

plurality of groups" (the input), and specifies the relationships with the "receiving unit" and the "transmitting unit" (which Apple does not dispute are structural terms) that enable the control information to be received and the selected sequence to be transmitted. Appx338(9:60-10:8). This Court has held that ¶6 does not apply under similar circumstances, *see, e.g.*, *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319-21 (Fed. Cir. 2004) ("circuit [for performing a function]" found to be sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1301 (Fed. Cir. 2014) ("heuristic [for performing a function]" found to be sufficiently definite structure in part because the claim described the operation and objectives of the heuristic). By contrast, in *Williamson* there was *no* instruction as to how the claimed "distributed learning control module" would perform the claimed tasks or interact with other components. *See* 792 F.3d at 1350-51.

The specification also gives structure to the term "selecting unit." As Optis's expert explained, a POSA would have understood "selecting unit" to refer to "a specially configured electronic circuit," wherein the "selecting unit [is] implemented as a sequence selector with a sequence or signature generator component, in either hardware or software."[8] Appx5355-5356(¶¶44-46); *see also* Appx338(9:26-48). He stated, citing the specification, that a POSA would

---

[8] It is not inconsistent for the limitation to *allow* but *not require* that the selecting unit generate sequences in addition to selecting them. *See* Br. 41.

understand the electronic circuit may be "an integrated circuit (e.g., LSI, IC), a programmed processor circuit, or a programmed logic circuit (e.g., FPGA)." Appx5356(¶45); *see also* Appx338(9:26-48) (listing these options).[9]  He supported his analysis with two references cited in the patent.  Appx5356(¶46).[10]  These facts also distinguish this case from *Williamson*, in which there was "nothing in the specification or prosecution history that might lead us to construe" the claim term as referring to a definite structure.  792 F.3d at 1351

In sum, because the "structure-connotating term ['selecting unit'] is coupled with a description of the [unit's] operation"—*i.e.*, randomly selecting a sequence from a plurality of sequences contained in a group of a plurality of groups— "sufficient structural meaning generally will be conveyed" to a POSA, and ¶6 does not apply.  *Linear*, 379 F.3d at 1320.

Apple argues that "unit" is tantamount to "means," but Apple appears to acknowledge that a "transmitting *unit*" (also recited in the claim) is not indefinite. Moreover, the term in question is "selecting unit," not "unit."  Apple points (at 40-

---

[9] Optis did not "vacillat[e] over whether a 'selecting unit' must be implemented in hardware or software."  Br. 41.  The unit may be implemented in *either* hardware *or* software, consistent with the specification's disclosure of exemplary embodiments "configured by hardware" and its disclosure that the selecting unit may also be "programmed."  Appx5034; Appx5033 n.7; *see also* Appx5356(¶46). "The limitation need not connote a single, specific structure; rather, it may describe a class of structures."  *Apple*, 757 F.3d at 1300.

[10] Apple claims (at 41), without explanation, that one of those references gives a "different meaning to 'selecting unit.'"  Appx6917(¶236).  But Optis's expert refuted that claim.  *See* Appx5356(¶46).

41) to the testimony of its own expert that "selecting unit" is used in different ways in different patents. But this ignores the claim language, specification, and prosecution history of *this patent*, which Optis's expert explained gave meaning to the term as used in the claims. *See* Appx7126-7127(¶43). The district court did not clearly err in crediting Optis's expert over Apple's in this regard. *See Williamson*, 729 F.3d at 1346 (clear-error standard). Apple argues (at 42) that the patent does not show how the selecting unit "works," or how it "interacts with other components," but it does. It states that the unit selects a sequence from a plurality of sequences "randomly." An algorithm is not required. *Apple*, 757 F.3d at 1298. And the patent describes, with words and pictures, how the selecting unit interacts with other components of the apparatus. *See* Appx335(4:57-67); Appx336(5:45-50); Appx323 (figure 1); Appx326 (figure 4); Appx332 (figure 10).

Even if ¶6 applies, the claim is not indefinite. A skilled artisan would recognize the structure in the specification that corresponds to the "selecting" function. *Williamson*, 792 F.3d at 1352. A specially configured electronic circuit (examples of which are listed in the patent) chooses "randomly" among a grouping of sequences that have been calculated using an algorithm disclosed in the patent, where the relevant grouping from which the random selection is made is identified based on the control information received. *See* Appx335(3:19-4:56); Appx336(5:45-49); Appx336(6:3-5); Appx5354-5356(¶¶41-47). By contrast, in

the cases on which Apple relies, there was *no* description of how the function was to be completed. *Williamson*, 792 F.3d at 1354; *Rain*, 989 F.3d 1002, 1007-08 (Fed. Cir. 2021); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518-19 (Fed. Cir. 2012); *Fiber, LLC v. Ciena Corp.*, 792 F. App'x 789, 795-96 (Fed. Cir. 2019).

Apple is wrong that the patent must provide a more detailed algorithm for the random selection. "For computer-implemented procedures, the computer code is not required to be included in the patent specification," and Apple has "directed [the Court] to no evidence that a programmer of ordinary skill in the field would not understand how to implement this function." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385-86 (Fed. Cir. 2011); *see also Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1335-36 (Fed. Cir. 2008) (an algorithm is not required for "basic mathematical techniques that would be known to any person skilled in the pertinent art") (citing *In re Dossel*, 115 F.3d 942, 946-47 (Fed. Cir. 1997)). The structure is adequate.

> b. *There was sufficient evidence for the jury to find that Apple practices the "select" and "generate" limitations of claim 1.*

Apple challenges the evidence that it practiced two claim limitations: that the device (1) "select a sequence from a plurality of sequences," and (2) "generate[]" the plurality of sequences "from a plurality of base sequences." Br. 44-45. The evidence was sufficient on both.

41

As to the first, Dr. Madisetti testified that Apple's method of "select[ing] a sequence by selecting the sequence index or the sequence signature" and then "generating the selected sequence [from the index] on the fly" practices that limitation. Appx1821(19:11-24); *accord* Appx2529-2532(75:1-78:6). He grounded his testimony in the patent, which states that the selecting unit "may select the code sequence … from the code sequences prepared in advance" *or* "select the CAZAC sequence number k and number of shifts m associated with the control information to be reported to generate a code sequence [] from equation 6 every selection." Appx2531(77:2-8); Appx336(5:63-6:2). He explained that this second option encompasses generating a sequence on the fly "[b]ecause equation 6 … is the equation for sequence generation." Appx2531(77:9-18). Dr. Madisetti drew an analogy: selecting by an index, he testified, is like calling someone by a name, as opposed to walking through the crowd and grabbing them. Both are ways of selecting a person from a group of people. Appx1671(471:5-22).

As to the second limitation—generating sequences from a plurality of base sequences—Apple asks the Court to credit Apple's witnesses. Br. 45. But, as the district court held (Appx157), the jury was entitled to credit Dr. Madisetti. Dr. Madisetti explained that the LTE standard requires generating sequences from a plurality of base sequences, and that Apple's devices use this standard. Appx1819-1821(17:20-19:12). He walked the jury through the standard with a demonstrative,

explaining that sequences, i.e., "random access preambles," are "generated from Zadoff-Chu sequences," which are in turn generated from "several Zadoff-Chu sequences," and that the "several Zadoff-Chu sequences" are "the plurality of base sequences." *Id.*; *see also* Appx26749; Appx30215-30216 (TS 36.211 at Section 5.7.2). Dr. Madisetti also showed that Apple's source code does the same, walking the jury through the terms in the code. Appx1821-1823(19:25-21:16); *see also* Appx26751-26752.

Finally, the jury could alternatively have found infringement under DOE, because Apple's products perform substantially the same function in substantially the same way to yield the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). Dr. Madisetti was permitted to incorporate his prior direct-infringement testimony into his DOE opinion. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007). Dr. Madisetti connected this testimony to the function-way-result test. He testified that the *function* of selecting the sequence is met by Apple's products as shown by "the process of creating the table of sequences in the code, the process of selecting a sequence, and the process of generating the selected sequence," Appx1824(22:1-6), and he explained that he had already demonstrated the *way* in which the source code, like the claims, associates different sequences with different reception qualities or amounts of data, Appx1823(21:8-16), and the *result* is the same: a

43

sequence is selected that is associated with different reception qualities or amounts of data based on the group from which it was selected, Appx1824(22:6). This testimony was sufficient.[11]

Even if Apple's process were more efficient (in terms of memory and battery life) than the claimed process, this would not prevent the jury from finding infringement under the DOE. Neither the claims nor the specification say anything about memory or battery life in particular, and Apple does not explain how either quality factors into the "function-way-result" test. The difference is irrelevant to DOE. *See, e.g.*, *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381-82 (Fed. Cir. 2000) (considering only functions that are linked to the invention).

**F.     This Court can affirm the infringement verdict despite any isolated error, because the damages award shows that the jury found *all* claims infringed.**

Apple incorrectly argues that, if it prevails on any one of the above issues, it is entitled to a new trial on infringement—even on patents as to which the Court identifies no error, or identifies error as to only one of multiple claims. Under the applicable Fifth Circuit law, where a general verdict rests on more than one alternative theory, an isolated error that affects only one theory (or a few, but less

---

[11] Apple argues that the testimony in *Paice* was more detailed. Br. 48. But the question is only whether there is "particularized testimony and linking argument … with respect to the function, way, result test." *Paice*, 504 F.3d at 1304-05. As explained, there was.

than all) is harmless. *See Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1310-11 (Fed. Cir. 2005). At most, an error pertaining to one patent could result in a retrial on *damages* with that patent excised.

As an initial matter, courts should be hesitant to invalidate the results of a trial where the error can be isolated: "[w]e have come a long way from the time when all trial error was presumed prejudicial." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553-54 (1984). Acting "in accordance with the salutary policy embodied in Rule 61," appellate courts do not reverse based on "errors that do not affect the essential fairness of the trial." *Id.*; *see* 28 U.S.C. § 2111 ("On the hearing of any appeal … the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no [error] is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

Consistent with these principles, the Fifth Circuit has held that a general verdict like the one here may be affirmed notwithstanding "the failure of evidence or a legal mistake under one theory of the case" where "the reviewing court can be reasonably certain that the jury did not base its verdict on an unsound theory."

*Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 271 (5th Cir. 1989); *see also, e.g.*, *Muth v. Ford Motor Co.*, 461 F.3d 557, 564 (5th Cir. 2006) (similar); *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elec. Am., Inc.*, 895 F.3d 1304, 1314-17 (Fed. Cir. 2018) (applying Fifth Circuit law to affirm general verdict of trade secret misappropriation despite legal error in one theory). In applying this harmless-error standard, the Fifth Circuit examines the record, considering, for example, the parties' focus at trial and the sufficiency of the evidence on the valid theories of liability, to determine (if possible) the theories on which the jury relied and whether the error affected its verdict. *See, e.g.*, *Texas Advanced*, 895 F.3d at 1316-17 (considering, in holding legal error harmless, strong evidence in favor of remaining theory of trade secret misappropriation); *Muth*, 461 F.3d at 565 (considering, in holding factual insufficiency harmless, fact that evidence presented on unsupported theory "was minimal" and that theory was "not mentioned during *voir dire*, opening argument, or closing argument"); *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984) (affirming judgment even though two theories were "submitted … in a single interrogatory" and there was insufficient evidence to support one, because the trial evidence and the jury's answers to other interrogatories refuted any suggestion "that the outcome of the trial would have been affected if the [second theory] had not been submitted to the jury").

Here, the record makes "reasonably certain" that any error did not affect the liability verdict. The key is the damages award: the first jury awarded Optis $506.2 million in damages, *see* Appx104, which is the exact amount that Optis's expert stated at trial would be required to compensate Optis for infringement of *all* the claims at issue. Optis's expert, Dr. Kennedy, testified that the proper measure of damages was $203.2 million for the '833 patent, $119.7 million for the '332 patent, $179.2 million for the '774 patent, $2.1 million for the '557 patent, and $2.0 million for the '284 patent. Appx1911(65:19-22). Plainly, the jury found all patents infringed, making any error with respect to one (or even several) patents harmless with respect to the liability verdict. So long as there is sufficient evidence to support a finding of infringement of any patent claim that is not infected with legal error, this Court should affirm the jury's general verdict.

A second aspect of the Fifth Circuit's harmless-error jurisprudence is relevant here, and applies irrespective of the damages award. The Fifth Circuit has held that, where there are multiple factual bases for a general verdict and one is insufficient, the Court "must assume that the jury considered all the evidence in reaching its decision," and rested its decision on the ground with sufficient factual support. *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992); *see also, e.g.*, *Nester v. Textron, Inc.*, 888 F.3d 151, 159-60 (5th Cir. 2018) (applying *Walther* rule); *WickFire, LLC v. Woodruff*, 989 F.3d 343, 359 (5th Cir. 2012)

(same). This Court has applied this rule in patent cases where Fifth Circuit law applies: "[w]e will uphold a verdict if there was sufficient evidence to support *any* of the plaintiff's alternative factual theories," because "we must assume the jury considered all the evidence and relied upon a factual theory for which the burden of proof was satisfied." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849-50 (Fed. Cir. 2010); *accord Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014). Thus, the Court must uphold the general verdict of infringement if there is sufficient evidence to support a finding that Apple's products infringed a *single* patent claim, irrespective of any factual insufficiency with respect to other claims.[12]

Apple makes two arguments why this rule should not apply; both are meritless. First, Apple argues that *Walther* should not apply where the verdict question encompassed more than one patent. Not so. Infringement is a fact question, and the different infringement theories offered alternative ways to answer the infringement question. *See, e.g.*, *Ericsson*, 773 F.3d at 1222 (indirect versus

---

[12] Apple cites *i4i* for the proposition that a general verdict must be set aside if there is any *legal* error, as opposed to factual insufficiency. Br. 49. But *i4i* merely states the "basic principle," upon which the Fifth Circuit has "engrafted a sort-of harmless error gloss." *Muth*, 461 F.3d at 564. At bottom, harmless-error review— which this Court has recognized applies even in cases of legal error, *see, e.g.*, *Avid Technology, Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1047 (Fed. Cir. 2016)— commands reversal only where a legal error could have changed the result. And here, because the jury's verdict shows that it found infringement of *all* patents, any error (legal or factual) with respect to one patent was harmless with respect to the others.

direct infringement); *cf. Northpoint Tech. Ltd. v. MDS Am. Inc.*, 413 F.3d 1301, 1311-12 (five different anticipation theories). Apple claims that multiple "causes of action" warrant a different rule, but that runs contrary to the Supreme Court case that *Walther* and this Court both relied on (*see Ericsson*, 773 F.3d at 1311). The Supreme Court has emphasized the "common-law rule" validating "verdicts returned on multicount indictments where some of the counts were unsupported by the evidence" so long as "any one of the counts is good and warrants the judgment." *Griffin v. United States*, 502 U.S. 46, 49-50 (1991) (quotations omitted). Although Apple is correct that "a jury cannot rely on a theory of infringement of one patent to find infringement of another patent," Br. 50, here, the jury was asked whether Apple infringed "any" patent, not a particular patent. Because "[t]he critical question is whether the evidence, taken as a whole, was sufficient to support the jury's verdict," *Northpoint*, 413 F.3d at 1311, the Court may uphold the verdict so long as there was sufficient evidence to support a finding of infringement of "any" patent. Apple's suggestion that *Walther* applies only where there is a single count in the complaint would reduce *Walther*'s rule to a happenstance of pleading. That makes no sense.

Second, Apple argues that *Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 79 (1907), precludes this Court from applying *Walther*'s rule. *See* Br. 50-52. Apple is wrong. As Apple acknowledges (at 51 n.2), the Fifth Circuit recently

reiterated that its holding in *Walther* is good law, and it addressed concerns about *Wilmington*, explaining that *Griffin* is intervening Supreme Court precedent. *See Nester*, 888 F.3d at 159-60. *Wilmington* also predated the federal statute codifying harmless-error review, now 28 U.S.C. § 2111, which was enacted in 1919. *See* Act of Feb. 26, 1919, ch. 48, 40 Stat. 1181; *Kotteakos v. United States*, 328 U.S. 750, 758 (1946) (discussing relevant history).

Apple protests that *Griffin* was a criminal case, but as this Court and the Fifth Circuit have recognized in repeatedly citing *Griffin*, that is a distinction without a difference. *Griffin* reasoned that, because jurors have "intelligence and expertise" as finders of fact, when they are given an unsupported and a well-supported ground for a general verdict, they are presumed to have relied on the well-supported ground. 502 U.S. at 48. That rationale applies equally to a civil case.

Apple misreads *Wilmington* (at 50-51); it does not hold that *any* insufficiency in a factual basis for a general verdict in a civil case requires reversal. The Court in *Wilmington* held only that "where it is *impossible from the record to say* upon which of the counts of the declaration the verdict was based," the judgment cannot be sustained. 205 U.S. at 79 (emphasis added). Even the First Circuit, which, as Apple points out (at 51), has continued to follow the *Wilmington*

rule after the adoption of Section 2111 and after *Griffin*, has held that the rule permits harmless-error analysis:

> Our own approach is by no means rigid. Recognizing that a jury is likely to prefer a better supported theory to one less supported, we have generously applied the harmless error concept to rescue verdicts where we could be *reasonably sure* that the jury in fact relied upon a theory with adequate evidentiary support.

*Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30 (1st Cir. 2004). This Court can be "reasonably sure," from the damages award and the multiple claims supported by obviously sufficient evidence, that this jury in fact relied upon a theory with adequate factual and legal support.

Apple is right about this much: error as to some patents, but not others, would require further proceedings on damages. The $300 million award at the second trial is based on all five patents and does not award a sum certain for any one. Thus, if the second damages award is the operative one, any error affecting fewer than all the patents should result in a retrial on damages alone, for infringement of the unaffected patents. If, however, this Court were to reinstate the original jury award (*see infra* Part III) *and* if it found error on all claims of some patents, the amount attributable to each patent would be readily ascertainable; in that instance, the Court should remand to the district court to consider remittitur.

But Apple is wrong in claiming that "the issues of infringement and damages are inseparable" such that damages *cannot* be retried without also retrying liability. Br. 54-55. This Court regularly remands for damages-only retrials—including in cases Apple cites. *E.g.*, *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1382 (Fed. Cir. 2021). The Seventh Amendment case Apple cites (at 55) actually *affirmed* the judgment at a damages-only trial and confirmed that "liability and compensatory damages are often severable." *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1356 (11th Cir. 2018). *Searcy* distinguished *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931), as the rare case in which liability and damages are factually intertwined, making the second jury speculate about which theories of liability the first jury found. 902 F.3d at 1355 & n.6.[13] But here, there is no need to speculate. The damages award makes

---

[13] In *Gasoline Products*, the jury found for the plaintiff on a claim for breach of contract. The Supreme Court held that an error on damages meant retrying liability, too, because a new jury could not "fix the amount of damages" unless it knew "the dates of formation and breach," and the record did not show what dates the first jury had found. 283 U.S. at 499-501. Similarly, in *Encompass Office Sols., Inc. v. Louisiana Health Serv. & Indem. Co.*, 919 F.3d 266 (5th Cir. 2019), the district court concluded that its own instructional error on contract claims also required a new trial on tort claims, because of "an overlapping of proof," and the Fifth Circuit found no abuse of discretion. *Id.* at 276-77 (citation omitted). Apple has identified no such overlap here—it just repeats (Br. 55) that a new jury would not know which patents were infringed, a point refuted above. Apple cursorily claims that a damages-only jury also needs to know "which features were found to infringe which patent." Br. 53. But there was no dispute that the jury knew which features corresponded to which patents. Appx3306-3311(237:18-242:7) ('774 patent), Appx3319-3320(250:2-251:11) ('284 patent), Appx3378-3381(16:18-

clear the jury found *all* patents infringed. If this Court were to narrow the jury's infringement finding to a subset of the five patents, retrying damages for that subset would be straightforward. Under those circumstances, allowing Apple to retry the entire case—including aspects of the jury verdict that are free from error—would violate the Reexamination Clause as well as harmless-error rules.

## III. The original damages verdict was not erroneous and should be reinstated.

The first jury received the instructions and evidence it needed to determine a royalty in line with FRAND principles. The district court erred by upending that verdict and holding a new trial simply because the term "FRAND" was not used. Before considering Apple's challenges to the damages retrial, therefore, this Court should take up Optis's cross-appeal and reinstate the jury's original award.

### A. The district court should have held Apple to its forfeiture.

Before trial, Apple did not object when the court excluded any mention of FRAND. Appx7851-7857. As the district court explained, Apple did so for tactical advantage: Apple "received a significant benefit by staying strategically silent during pretrial proceedings, preventing the jury from hearing potentially

---

19:21) ('833 patent), Appx3390-3392(28:15-30:25) ('332 patent); Appx3397-3399(35:11-37:13) ('557 patent). Moreover, Apple never raised this issue before the district court, and it mentions the point only in passing; it never develops any explanation for why the jury would not have known which features corresponded to which patents. The argument is waived. *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1377 n.17 (Fed. Cir. 2014).

harmful evidence regarding Apple's alleged bad faith conduct or holdout." Appx143; p. 6, *supra*.

Only *after* Apple was unhappy with the outcome did it have a "post-trial epiphany," Appx143, and seek a new trial with FRAND evidence and instructions, the exclusion of which Apple had previously welcomed. For that reason, the district court explicitly found that Apple had waived any FRAND defense to the first damages award. Appx143. Yet it inexplicably reversed itself and ordered a new trial so that the jury could hear about the parties' FRAND commitments. The district court should have held Apple to its forfeiture. *See Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) (reversing grant of new trial in part because plaintiff "waived any objection to the impropriety of [defendant's] closing argument," instead choosing to rebut and capitalize on that argument in its own closing, and making no objection until after its "strategy failed").

## B. There was no prejudicial instructional error.

The district court erroneously ordered a new trial without "point[ing] to any specific flaws in the instructions as given, or what different proposals, objections, and approach would have been taken or justified." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1581 (Fed. Cir. 1986). The court did not even attempt to apply the correct standard, which required Apple to "demonstrate that

the charge as a whole create[d] substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Z4 Techs, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007) (citing Fifth Circuit law). To evaluate prejudice, "the full trial record and the jury instructions in their entirety must be examined because instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." *Sulzer*, 358 F.3d at 1363 (internal quotation omitted). Had the court examined the issue properly, it would have found no error and no prejudice.

The instructions were proper. FRAND encompasses two contractual commitments: one by any patent holder whose patents are included as part of a technical standard to offer licenses to those patents on terms that are "fair, reasonable, and non-discriminatory," and one by any party wishing to implement the standard in its products to accept a license on those same terms. In cases involving a FRAND commitment, "any royalty award must be based on the incremental value of the invention, not the value of the standard as a whole or any increased value the patented feature gains from its inclusion in the standard." *Ericsson*, 773 F.3d at 1235; *accord HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476, 485 (5th Cir. 2021).[14]

---

[14] Courts around the country have understood a FRAND-compliant royalty similarly—*i.e.*, to require apportionment. *See, e.g.*, *HTC Corp.*, 12 F.4th at 485; *Audio Mpeg, Inc. v. Dell, Inc.*, 2017 WL 11682742, at *6 (E.D. Va. Oct. 6, 2017);

The district court's instructions encompassed these principles, despite not invoking "FRAND." The court instructed the jury to determine "the amount that a licensor, such as Optis, and a licensee, such as Apple, would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement." Appx2648(990:2-5). It instructed that "the patented feature must be apportioned from all the unpatented features reflected in the standard." Appx2649(991:9-10). And it instructed that "the patent owner's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology." Appx2649(991:11-14).[15]

Apple did not ask for anything more; it "stay[ed] strategically silent." Appx143.

The district court apparently interpreted *Ericsson* to create a bright-line rule requiring a new trial "where [a] jury never heard the acronym FRAND." Appx144. But *Ericsson* disavowed any "bright line rules" about instructions in FRAND cases; what mattered was that the jury understand what the FRAND

*Zenith Elecs., LLC, v. Sceptre, Inc.*, 2015 WL 12830689, at *2 (C.D. Cal. Feb. 5, 2015); *Evolved Wireless, LLC v. Apple Inc.*, 2019 WL 1100471, at *6 (D. Del. Mar. 7, 2019). Apple's damages expert agreed. Appx15030(¶58); Appx2987(62:18-25); Appx2465(11:12-18).

[15] The instructions at the second trial repeated the same apportionment principles. *See* Appx3949(35:7-22). The district court added only that Optis had agreed to "license the asserted patents on fair, reasonable, and nondiscriminatory or, as you've heard it called, FRAND terms and conditions," that "[t]he FRAND commitment in this case does not require any specific licensing model to determine a FRAND royalty," and that the jury "should determine a FRAND royalty in this case based on the totality of the circumstances." Appx3948(34:24-35:2).

commitment entailed and apportion the value of the patented technology from the value of the entire standard and the value of inclusion in the standard. *See* 773 F.3d at 1229-32, 1235. As already explained, the instructions conveyed those principles.

The only instructional error Apple purported to identify below was the court's directive to consider *Georgia-Pacific* factor 5, "[t]he commercial relationship between the licensor and the licensee." *Ericsson*, 773 F.3d at 1230-31; *see* Appx16111-16112; Appx16018-16020. While this Court has held that this factor is "irrelevant" in a FRAND case, because a licensor must "offer licenses at a *non-discriminatory* rate," it has also held that "[r]eference to irrelevant *Georgia-Pacific* factors would not—in most instances—be sufficiently prejudicial to warrant reversal" absent additional instructional errors. *Ericsson*, 773 F.3d at 1230-31 & 1231 n.7. Apple identified no additional instructional error relating to the FRAND question and no specific prejudice from the wording of this instruction.

### C. No material FRAND evidence was excluded.

Exclusion of evidence warrants a new trial only if the evidence "would have altered the outcome of the case." *Echeverry v. Jazz Casino Co.,* 988 F.3d 221, 235 (5th Cir. 2021). The district court awarded a new trial on the ground that the jury did not hear evidence about how the "concept [of FRAND] impacted a fair

damages award in this case," without identifying any specific evidence that would have changed the outcome. Appx144.

But the instructions addressed all the FRAND factors on which the jury heard evidence. The verdict was consistent with all relevant FRAND principles of reasonableness, apportionment, and willing negotiation. The jury's $506.2 million award was the exact amount that Optis's expert, Mr. Kennedy, testified was appropriate to compensate Optis for infringement of all claims. Appx1911-1912(65:13-66:9). Mr. Kennedy's number was based on an analysis that apportioned the contribution of the infringing technology from the non-patented elements of the standard, just as FRAND requires. Appx1889-1896(43:20-50:17). Optis also presented testimony that Apple lacked non-infringing alternatives, another measure of the technical contribution. *E.g.*, Appx1469-1470(82:25-83:17). Apple countered with Dr. Perryman, who also appealed to FRAND principles, despite not mentioning the term. He testified that the "proper approach" was to capture "the value of the functionality of the claimed invention in a given SEP contributes to the value of the relevant functionality of the smallest salable unit that practices the claims of the SEP." Appx2465(11:12-18). In other words, he offered the jury his views of how best to apportion the value of the patented technology from the standard, to determine a FRAND-compliant royalty. Dr. Perryman testified that the number of patents incorporated into the standard, and the inflation

of SEP value by royalty-stacking, meant the properly apportioned value of each patent within the standard was low, Appx2463-2466(9:9-12:18), and he detailed the substance of Apple's FRAND licensing policy and its application in licensing agreements, Appx2459-2460(5:3-6:22), Appx2464(10:11-21), Appx2466-2470(12:14-18, 13:5-16:9), Appx2473-2475(19:20-21:9).[16]

None of the evidence Apple cited would have changed the outcome. Apple referred cursorily to categories of evidence about Optis's FRAND commitment, *see* Appx16018, but, despite FRAND being fair game at the second trial, Apple did not focus on that evidence—much less argue that Optis failed to comply with its commitment, or that Apple had kept *its* commitment. Instead, Apple emphasized evidence from past licenses that, according to Apple, supported a lower royalty.[17] But this evidence could have been submitted at the first trial. In substance, it was: both parties created a robust record on all the supposedly excluded categories of evidence Apple gestured to in its new-trial motion (*e.g.*, the apportionment

---

[16] It is not surprising that FRAND principles dominated the first trial despite the court's instruction that "FRAND" not be mentioned by name. As Apple acknowledged below, this Court "has made clear" in cases like *Ericsson* that "***regardless*** of whether there is a FRAND commitment," "reasonable royalties for any standard-essential patent ('SEP') must be apportioned so as not to include any value flowing to the patent from the standard's adoption." Appx15300 (quotations omitted).

[17] *See, e.g.*, Appx3645(283:12-18); Appx3647(285:3-8); Appx3648(286:11-15); Appx3649(287:10-15); Appx3650(288:8-12); Appx3651(289:14-18); Appx3652(290:15-19); Appx3653-3654(291:24-292:3); Appx3681(11:11-15); Appx3817(147:6-12); Appx3832(162:9-17).

principles underlying the FRAND commitment, the application of those principles to the reasonable-royalty analysis here, and Apple's own licensing policy).[18]

Thus, the mere omission of the term "FRAND" was neither erroneous nor prejudicial. The damages award should not have been disturbed.

## IV. Apple has identified no error at the second damages trial that would require vacatur.

If the Court rejects Optis's cross-appeal and affirms the grant of the new damages trial, it should affirm the jury's verdict from that retrial. The jury was properly instructed to find damages for infringement of all five patents, in light of the verdict at the first trial. And the evidence Apple contends should not have been admitted was relevant and not unduly prejudicial. Apple's critiques are either waived or were adequately addressed through cross-examination.

### A. There is no "disconnect" between the liability verdict and the damages verdict.

Apple argues that "[t]he damages verdict should be vacated because it was not supported by any jury finding of infringement." Br. 52. But the first jury found infringement, and it awarded damages in the exact amount Optis's expert testified was appropriate for infringement of *all patents*. *See* pp. 5, 47 *supra*. The district court instructed the second jury accordingly. That was no abuse of its

---

[18] In the event of a remand, the district court should have the opportunity after the jury trial to reconsider whether to grant Optis's requested declaration that it met its FRAND obligation. *See* Appx123-124.

"wide discretion" to interpret the jury's verdict. *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir. 1988).

Apple's insistence that the district court gave the retrial jury the "impermissible task" of figuring out *which* patents the first jury found infringed, Br. 53, cannot be squared with the record. The jury was instructed that all five patents were infringed, and its *only* task was to calculate a reasonable royalty to compensate Optis for the infringement. *See, e.g.*, Appx203(114:18-20) ("your job in this case is to decide what amount of money damages, if any, to be awarded to the Plaintiffs as compensation for the infringement of their five patents"); Appx3946(32:6-11); Br. 54. Indeed, counsel for Apple understood as much: he emphasized in closing that "the question is, what are the value of these five [patents] as among the larger group of thousands of patents [that cover LTE]." Appx3975(61:11-15).

### B. The district court did not abuse its discretion in admitting the Apple-Qualcomm agreements.

The Apple-Qualcomm agreements are relevant, and the district court properly left weighing their relevance to the jury. Apple's minor critiques of their comparability are a basis for cross-examination, not exclusion.

To begin, Optis's expert Dr. Kennedy in no way "admitted" (Br. 58) that the agreements were so noncomparable as to be irrelevant. Kennedy's full statement reads:

> None of the Apple licenses here are sufficiently comparable to the Hypothetical License for use as a *direct indication* of a reasonable royalty rate. However, Apple did enter into licenses with at least █number█ sophisticated licensors and owners of significant SEP portfolios [including] Qualcomm [in] 2019. Due to that similarity, Apple's licenses with these companies are *informative and would be a consideration* for PanOptis in the hypothetical negotiation.

Appx7512(¶416) (emphases added). Kennedy's approach is consistent with this Court's case law. This Court "ha[s] never required identity of circumstances; on the contrary, [it] ha[s] long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (citations omitted).

This Court's review on these issues is deferential. "[C]omparability is often [an issue] of sufficiency of the evidence, not admissibility." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020). There need only be a "basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

There was a basis in fact here. As Kennedy explained, he relied on the licensing agreement, under which Apple licensed Qualcomm's SEPs for a royalty of █%█ of the iPhone price, capped at █value█ a phone, *see* Appx16184(¶392), for its relative royalty structure for the three sets of Apple's products at issue (iPhones, tablets, and watches). Appx3537-3538(175:9-176:3); Appx3542-3543(180:22-

181:15).  This royalty was also used to rebut Apple's claim that all the patents in the industry were worth only $5 per product.  *See* Appx3538-3539(176:9-177:3) (Kennedy);  Appx16189-16190(¶¶477-478).  And it was used to rebut Apple's claim that a license tied to the device is not FRAND.  Appx16189(¶477); *see also* Appx3538(176:6-11)  (Kennedy);  Appx3628-3629(266:5-267:3)  (Apple's expert). Given this limited use, it does not matter that the scopes of the licensing agreement and the hypothetical negotiation were different.  *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380-81 (Fed. Cir. 2021), and *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971-74 (Fed. Cir. 2022), are therefore not on point.

As for the ░dollar amount░ settlement agreement, Kennedy explained that the core dispute settled in that agreement was the licensing of 40 SEPs subject to a litigation where the plaintiff sought a FRAND royalty.  Appx16184-16186(¶¶394-99); Appx1907(61:7-15); *see also* Appx3541(179:7-24).  Professors Madisetti and Mahon reviewed those SEPs and found that they were "technically comparable to the Patents in Suit."  Appx16187(¶¶405-08);  Appx3325-3326(256:15-257:1); Appx3407(45:2-24); Appx3539-3540(177:21-178:21).  Kennedy then applied the same methodology Apple's damages expert had used in settlement arrangements of this type to assess how much Apple paid for a license to each of the comparable Qualcomm patents.  Appx16187(¶409); Appx3541(179:7-24).  This analysis accounted for differences in scope.

Kennedy's careful analysis makes this case different from the cases on which Apple relies. In those cases, the experts failed to link the licenses or the royalty rates they advocated to the facts of the case—whether by a per se rule or conclusory testimony. *See Uniloc*, 632 F.3d at 1315-17 (the "25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation" because it "fails to tie a reasonable royalty base to the facts of the case at issue"); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1349-50 (Fed. Cir. 2018) (expert's opinion that parties would have agreed to 5% royalty inadmissible where expert did not explain how she calculated rate based on facts of the case); *Lucent*, 580 F.3d at 1328-29 (damages award not supported by license agreements directed to a "vastly different situation" and agreements introduced with "superficial testimony" that did not connect the licenses to facts of the case, "particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here"). Kennedy did not advance any per se rule here, and he linked the licenses to the facts of this case.

Apple reasserts its same critiques: the agreements were pressured by litigation, they were different in scope, and Qualcomm had leverage over Apple. Br. 60-62. But, as the district court held, *see* Appx64(28:8-11), these concerns could be addressed through cross-examination. And they were. Appx3579-

64

3606(217:15-247:3). "No more is required in these circumstances." *VirnetX*, 767 F.3d at 1330; *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("degree of comparability" is a "factual issue[] best addressed by cross examination not exclusion"). None of Apple's distinctions makes the Qualcomm agreements inadmissible, and Apple completely fails to liken this case to the outlier case it cites. *See LaserDynamics Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012) (excluding licensing agreement entered into under "unique coercive circumstances," "on the eve of trial after [licensing party] had been repeatedly sanctioned by the district court," where the settlement was six times the next highest amount paid to license the patents-in-suit).

## C. References to Apple's profitability were not prejudicial.

Apple also argues that the jury was influenced to award inflated damages due to passing comments about Apple's "dominance" in the industry and its earning 87% of the industry's profits. That argument is meritless. The district court instructed the jury *not* to consider Apple's profits as a whole, and regardless, Apple's dominance of the cell-phone market is hardly a surprising fact that would have prejudiced the jury.

To the extent Apple means to challenge the admission of testimony regarding Apple's profits *relative to* Company *profits* on the accused devices, *see* Br. 63 (referencing that evidence); *see also* Appx3291(222:3-14),

Appx3509(147:5-25) (testimony regarding relative profits), that challenge fails. Apple did not raise that objection at trial, *see* Appx3291, and for good reason: Apple itself relied on evidence regarding ▮Company▮ and Apple's relative unit sales to argue that ▮Company▮ was similarly situated to Apple. *See* Appx245; *see also* Appx3257(188:18-24); Appx3260(191:2-6), Appx3547(185:10-14); Appx3984(70:2-9). Evidence that profits were higher for Apple than for ▮Company▮—and thus that the companies are *not*, as Apple argues, "similarly situated in the cellular industry" (Br. 64)—was relevant to whether the royalty rates paid by ▮Company▮ would also be a fair royalty rate for Apple. *See Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303-04 (Fed. Cir. 2015) ("comparable license valuations" must take into account "differences in … economic circumstances of the contracting parties"); *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1379 (Fed. Cir. 2022) (appropriate for damages expert to consider different levels of profitability between licensees in determining reasonable royalty rate, because accounting for "differences in the economic circumstances of the parties … is exactly what our case law requires"). Apple's objection therefore is both forfeited and meritless.

As for the passing comments about Apple's size and profits more generally, the court gave a cautionary instruction to protect Apple from any prejudice:

> [T]o the extent you heard testimony about the overall profits of Apple as a company, a company-wide profit, you should disregard that. To

> the extent you're hearing testimony about the profit margins for Apple related to the accused iPhone and related devices, that's perfectly fine. But you should not consider profits of the company as a whole; only the company's profits as to these particular devices.

Appx3509(147:5-12); *see also* Appx3509-3510(147:15-148:17) (similar). Counsel for Apple agreed that the court had "said it exactly right." Appx3507-3508(145:3-146:7).

As the district court noted, it cannot have been a surprise to the jurors that Apple is a big company and dominates the cell-phone industry. *See* Appx3510(148:7-11) ("I don't think anybody would dispute and I don't think it's improper testimony for the witness to establish that Apple is a large company."); *see also, e.g.*, *Ultimatepointer, L.L.C. v. Nintendo Co.*, 2014 WL 12304975, at \*3 (W.D. Wash. Nov. 19, 2014) ("The success of the Nintendo Wii is already a well-known fact, and Defendants will not be prejudiced by the jury hearing it."). Indeed, Apple practically told the prospective jury as much in voir dire. *See* Appx3129(60:15-24) (counsel for Apple acknowledging, after polling the jury, that it "[m]ight be easier to say, who does not own—who has never owned an Apple product?"); Appx3132(63:10-12) (counsel for Apple acknowledges to jurors that Apple is a "big company"). Apple has established no prejudicial error.

**D. Apple's objection to the admission of confidential settlement negotiations is waived and meritless.**

Apple argues that the district court abused its discretion in allowing evidence that Optis "repeatedly asked Apple to take a license for the LTE technology that [Optis] held," including a "license for $500 million" and that "Apple declined" in favor of "litigation." Br. 64. According to Apple, these statements are subject to the parties' NDA and Rule 408, and their admission prejudiced Apple by painting it as an "unwilling licensee deserving punishment through an inflated damages award." Br. 65. This argument is waived and meritless.

Recall that Apple first sought to prevent the jury from hearing about the parties' licensing negotiations by agreeing to submit the parties' respective compliance with their FRAND obligations to the court in a bench trial. Only after Apple did not like either the jury verdict or the result of the bench trial did Apple seek a new trial at which the jury would consider FRAND compliance.

Having gotten the new trial it sought, Apple had put on the table the questions of whether Optis had offered to license its SEPs on FRAND terms and whether Apple was obligated to accept any such offer. Apple knew that assessing FRAND compliance would entail assessing the parties' respective licensing offers. Once an SEP holder offers a FRAND-compliant license, an implementer is obligated to accept any such offer. *Optis Cellular Tech. LLC v. Apple Retail U.K.*

68

*Ltd.*, 2022 WL 14915910, EWCA (Civ) 1411 (Eng.) (Apple ordered to accept Optis's FRAND-compliant offer for a license to the patents at issue here).

Yet before the second trial, Apple moved to exclude evidence of the parties' licensing negotiations. Appx8417-8418. Understandably, given its relevance to the entire point of the retrial, the district court denied that motion. Appx149-150; *see also In re MSTG, Inc.*, 675 F.3d 1337, 1345 (Fed. Cir. 2012) ("settlement negotiation evidence would be admissible [under Rule 408] where the settlement itself or its interpretation is at issue"). After the denial, Apple itself threatened to introduce negotiating evidence, leading Optis to offer to refrain from introducing evidence of licensing negotiations if Apple would agree to do the same. Appx8898. Apple chose to introduce the licensing negotiation evidence anyway, starting with a demonstrative used in its opening statement. Appx40018.

The district court rightly concluded that, by starting the trial as it did, Apple waived any objection to Optis's own evidence on that topic. Appx252 (the parties' choice to "introduce evidence covered under the parties' NDA, beginning with a slide in Apple's opening demonstratives, was their prerogative"); Appx3176-3177 (counsel for Optis stated, "my understanding is that Apple … invited licensing negotiation history," and the district court agreed, "I think it's clear at this point that neither side believes it's improper to go into that"). That ruling was correct, and was certainly not an abuse of discretion.

Nor does Apple's theory of prejudice have merit. Apple speculates that the jury may have "punished" Apple, rather than neutrally enforcing Apple's FRAND obligations, but the court's instructions before and after trial clearly told the jury not to do that. Appx3946-3947(32:22-33:1) ("You … must not include any additional amount for the purposes of punishing Apple or setting an example."); Appx3184(115:12-17) ("You may not include in any damages award an additional amount as a fine or a penalty…."). Apple's counsel reminded the jury of those instructions during trial, eliciting a "yes" response to the questions: "You were also here when Judge Gilstrap gave his preliminary instructions and talked about this case not being punitive. Did you hear the Judge say that?"; "[S]o you'd agree that this case is not a case where you're asking the jury to punish Apple. Is that correct?"; and "You'd agree the jury's task is not t[o] punish Apple. Correct?". Appx3255-3256(186:17-187:1). Apple can show neither an abuse of discretion nor prejudice.

## CONCLUSION

The Court should affirm the district court's judgment of liability, reverse the court's decision ordering a new damages trial, and order the original damages award reinstated. Absent the latter, the Court should affirm the damages award entered after retrial.

Respectfully submitted,

/s/ William M. Jay

Jason C. Sheasby
H. Annita Zhong
Andrew J. Strabone
IRELL & MANELLA LLP
Suite 900
1800 Avenue of the Stars
Los Angeles, CA 90067
Tel.: 310.277.1010
Fax.: 310.203.7199

February 13, 2023

William M. Jay
Matthew Ginther
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC  20036
Tel.:  202.346.4000
Fax.:  202.346.4444

Edwina B. Clarke
William Evans
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: 617.570.1000
Fax.: 617.523.1231

*Counsel for Cross-Appellants*

**CERTIFICATE OF SERVICE**

I, William M. Jay, hereby certify that on February 13, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ William M. Jay*
William M. Jay

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(2)(A). This brief contains 16,348 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2016.

*/s/ William M. Jay*
William M. Jay

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** <u>Nos. 2022-1904, 2022-1925</u>

**Short Case Caption:** <u>Optis Cellular Tech., LLC v. Apple Inc.</u>

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>6</u> number of unique words (including numbers) marked confidential.

☑    This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐    This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐    This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: <u>02/13/2023</u>

Signature: <u>/s/ William M. Jay</u>

Name: <u>William M. Jay</u>

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

**ORDERS**

Opinion and Order as to Bench Trial Together with
Supporting Findings of Fact and Conclusions of Law,
Dkt. No. 538 (Jan. 22, 2021) [Redacted].................................... Appx107-Appx132

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OPTIS WIRELESS TECHNOLOGY, LLC, OPTIS CELLULAR TECHNOLOGY, LLC, PANOPTIS PATENT MANAGEMENT, LLC, UNWIRED PLANET, LLC, UNWIRED PLANET INTERNATIONAL LIMITED, | §<br>§<br>§<br>§<br>§<br>§ | |
| | § | CIVIL ACTION NO.  2:19-CV-00066-JRG |
| *Plaintiffs*, | §<br>§<br>§ | **FILED UNDER SEAL** |
| v. | §<br>§ | |
| APPLE INC., | §<br>§<br>§ | |
| *Defendant*. | § | |

## OPINION AND ORDER AS TO BENCH TRIAL TOGETHER WITH SUPPORTING FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a jury trial in the above-captioned patent infringement case from August 3, 2020 through August 11, 2020.  (Dkt. Nos. 460, 461, 466, 474, 482, 485, 486.)  The jury delivered a verdict that Defendant Apple Inc. ("Apple" or "Defendant") willfully infringed the asserted patents on August 11, 2020.  (Dkt. No. 483.)

Following the jury trial, the Court conducted a bench trial on the issues of  Count VIII by Plaintiffs Optis Wireless Technology, LLC ("Optis Wireless"); Optis Cellular Technology, LLC ("Optis Cellular"); PanOptis Patent Management, LLC ("PanOptis"); Unwired Planet, LLC ("Unwired Planet"); and Unwired Planet International Limited ("UPIL") (collectively, "Optis" or "Plaintiffs") and Apple's waiver defense on August 11, 2020.  (Dkt. No. 487.)  The parties submitted proposed findings of fact and conclusions of law as to these two claims.  (Dkt. No. 528, 533.)  Pursuant to Federal Rule of Civil Procedure 52, the Court issues its Findings of Fact and

**Appx107**

Conclusions of Law as set forth below to support its ruling herein as to these remaining claims which have been tried to the bench.

### FINDINGS OF FACT ("FF")

#### a. Procedural History

[FF1]     Optis filed the above-captioned case against Apple on February 25, 2019, asserting infringement of seven patents under the laws of the United States.  (Dkt. No. 1 ¶ 1.) Plaintiffs filed a First Amended Complaint on May 13, 2019.  (Dkt. No. 26.)

[FF2]     Plaintiffs allege "[t]here is a dispute between the Plaintiffs and Apple concerning whether the Plaintiffs' history of offers to Apple for a global license to the Plaintiffs' essential patents complies with the Plaintiffs' commitment to license their essential patents on FRAND terms and conditions pursuant to ETSI and ETSI's IPR Policy."  (*Id.* ¶ 143.)  To that end, Plaintiffs noted:

> The Plaintiffs are seeking relief in the United Kingdom ("UK") (more precisely, in the High Court of England and Wales, which has already determined FRAND terms including royalty rates for part of the Plaintiffs' patents with respect to another company) in respect of Apple's infringement of certain UK patents. As part of those proceedings the Plaintiffs have requested the UK Court to make a determination as to the FRAND license terms in respect of the Plaintiffs' worldwide portfolio (the "UK FRAND Proceedings"). Accordingly, the UK FRAND Proceedings will determine FRAND terms for Plaintiffs' worldwide portfolios.

(*Id.* ¶ 144.)

[FF3]     Accordingly, "[t]o the extent necessary beyond the UK FRAND Proceedings, the Plaintiffs request a declaratory judgment in this Court that negotiations toward a FRAND license with Apple were conducted in good faith, comply [*sic*] with the ETSI IPR Policy, and were consistent with competition law requirements."  (*Id.* ¶ 145.)  Optis requests such relief

### Appx108

in Count VIII, which requests a declaratory judgment that the plaintiffs have not violated FRAND or competition law. (*Id.* ¶¶ 140–146.)

### b. Standards Setting Organizations and Standards Essentiality

[FF4] The European Telecommunications Standard Institute, or ETSI, is a standard-setting organization based in France. (Dkt. No. 178-02 ¶ 14.) ETSI has adopted an Intellectual Property Rights ("IPR") Policy that sets out rules and obligations for ETSI members. (Dkt. No. 508 at 28:3–9; DTX-0068; Dkt. No. 509 at 81:7–10, 91:1–8.) The ETSI IPR Policy defines an IPR as follows:

> **"IPR"** shall mean any intellectual property right conferred by statute law including applications therefor other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

(DTX-0068 at 6; Dkt. No. 508 at 28:4–29:21.)

[FF5] ETSI members are obligated to follow the ETSI IPR Policy. (Dkt. No. 508 at 28:14–17, 158:14–21; Dkt. No. 528-1 at 89:20–23; Dkt. No. 509 at 69:13–14, 141:19–25.) As discussed below, the ETSI IPR Policy sets out terms with which participants must comply, including a commitment to timely disclose IPR to ETSI and a commitment to license IPR on fair, reasonable, and non-discriminatory ("FRAND") terms.

### 1. FRAND

[FF6] The ETSI IPR Policy addresses the availability of licenses on FRAND terms:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms and conditions under such IPR to at least the following extent:

# Appx109

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

(DTX-0068 at § 6.1.)

[FF7]    Clause 6.1 of the ETSI IPR Policy requires owners of intellectual property rights which are essential in relation to a particular standard or technical specification to declare that they are prepared to grant irrevocable licenses on FRAND terms and conditions. (Borghetti Op. Rep. ¶ 12.)  The commitment resulting from a Declaration made pursuant Clause 6.1 is governed by French law and is intended to be legally binding.  (*Id.*)

[FF8]    The ETSI IPR Policy defines ESSENTIAL as follows:

**"ESSENTIAL"** as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(DTX-0068 at 6; Dkt. No. 508 at 28:4–29:21.)

[FF9]    One sub-organization of ETSI responsible for developing cellular standards is the Third Generation Partnership Project, or 3GPP.  (Dkt. No. 509 at 80:21–81:10.)  For example, 3GPP developed the Long Term Evolution ("LTE") standard.  (Dkt. No. 509 at 81:11–82:18.)  3GPP does not have its own IPR Policy; instead, 3GPP participants are expected

4

# Appx110

to follow the IPR Policies of the organizational partners to which they belong.  (Dkt. No. 508  at 27:22–25, 158:14–21; Dkt. No. 528-1 89:20–23; Dkt. No. 509 at 69:13–14, 141:19–25.)

### 2.   *Procedural History of Count VIII*

[FF10]   Optis filed a First Amended Complaint on May 13, 2019 alleging that "[t]here is a dispute between the Plaintiffs and Apple concerning whether the Plaintiffs' history of offers to Apple for a global license to the Plaintiffs' essential patents complies with Plaintiffs' commitment to license their essential patents on FRAND terms and conditions pursuant to ETSI and ETSI's IPR Policy."  (Dkt. No. 26 ¶ 143.)  Count VIII seeks "[a] declaration that Plaintiffs, in their history of negotiations with Apple in regard to a global license to the Plaintiffs' essential patents, have negotiated in good faith and otherwise complied with FRAND . . . ."  (*Id.* ¶ 109.)

[FF11]   Apple filed a Motion to Dismiss Count VIII of Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction  (Dkt. No. 16), which the Court granted-in-part and denied-in-part.  (Dkt. No. 102.)  The Court dismissed "any portion of Count VIII that seeks a declaration that Plaintiffs have complied with their obligations under foreign laws or as they relate to foreign patents, or that Apple may not raise a FRAND defense in a foreign jurisdiction."  (*Id.* at 6.)  The Court explained that "[l]ike claims for foreign patent infringement, claims asking the Court to pass upon foreign obligations under foreign laws related to foreign patents are best left to the courts of those foreign countries."  (*Id.*)

[FF12]   The motion was denied "as to Plaintiffs' request to declare the parties' rights with respect to U.S. patents or under U.S. state or federal law," which the Court declined to dismiss.  (*Id.* at 9.)   Nevertheless, the Court cautioned that "[w]hether or not Plaintiffs can *prove* these allegations in a manner sufficient to allow this Court to issue declaratory relief is a separate issue more appropriately analyzed under Rule 56 or at trial."  (*Id.* at 8 (emphasis in original).)  The

5

# Appx111

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

Court further concluded that it "remains under 'a continuing obligation to examine the basis of

[its] jurisdiction' and will not issue an advisory opinion if it becomes clear that there is no

justiciable controversy before the Court." (*Id.* (citation omitted).)

### 3.    *Negotiations Between the Parties*



6

**Appx112**

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



7

Appx113

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**



8

### 4.     *Late Disclosure*

[FF21]     The ETSI IPR Policy also imposes intellectual property right disclosure requirements on ETSI members:

> [E]ach MEMBER shall use its reasonable endeavours in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitted a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(DTX-0068 at § 4.1; Dkt. No. 508 at 28:4–29:21.)

[FF22]     Clause 4.1 establishes two requirements to disclose relevant IPRs: (1) a general obligation to disclose when a member becomes aware of essential IPRs and (2) a specific obligation to promptly disclose any IPRs that might be essential when a member submits a technical proposal relating to that IPR.  (DTX-0068 at § 4.1; Dkt. No. 508 at 28:22–29:9 ("[T]he disclosure obligation consists of two parts.  The first one is the generic part where a member becomes aware of any potentially essential IPR.  In that case, it has to declare such IPR in a timely fashion.  And the second sentence says for the specific case where a member submits a technical contribution, and in that case, it has to declare any IPR which is related to that technical contribution prior to the adoption of a proposal.").)  IPR is considered disclosed when any patent in the family is disclosed to ETSI.

[FF23]     The ETSI Guide on Intellectual Property Rights explains that "[t]he [ETSI IPR] Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR." (DTX-1640 at 5.)  The Guide further explains:

> *"Intentional Delay" has arisen when it can be demonstrated that an ETSI Member has deliberately withheld IPR disclosures*

9

# Appx115

> *significantly beyond what would be expected from normal considerations of "Timeliness."*
>
> This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR Policy. In complying with the requirements of timeliness under section 4.1 of the IPR Policy, Members are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential.

(*Id.* at 7-8; *see also id.* at 17 ("Intentional non-disclosure of EIPR [Essential IPR] generally occurs in two instances: 1) when a representative participating in a Technical Body on behalf of a Member has actual knowledge of EIPR, and yet the Member holds back notification; or, 2) when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations.").)

[FF24]     There are myriad deadlines incorporated into the development of technical specifications for standards.  One such deadline was Stage 3 of the LTE specification development cycle, which involved "the actual detailed designs, and that includes the signaling flows and the messages and things that are required for interoperability and compliance."  (Dkt. No. 509 at 82:3–6.)  As listed on the 3GPP website, the Stage 3 freeze date for each of 3GPP TS 36.211, 3GPP TS 36.212, 3GPP TS 36.213, 3GPP TS 36.321, and 3GPP TS 36.331 was December 11, 2008.  (DTX-0173 at 14–15; Dkt. No. 508 at 39:21–42:11.)  There are various groups in 3GPP, and "even when the specifications are completed at the Stage 3 stage, there often needs to be some checks that go back and forth [between the groups] to make sure that they're completely complementary."  (Dkt. No. 509 at 84:19–85:19.)

[FF25]     A subsequent date, the TTCN freeze date, "is essentially the development of test cases and the code for those test cases that runs in test equipment that's used to evaluate products to make sure that they will comply with the standard.  And that's a requirement before those products can go to market."  *(Id.* at 82:7–12.)  The TTCN stage is not optional and technical

10

# Appx116

items "all have to go through that [TTCN] stage." (*Id.* at 82:19—25.)  The 3GPP website describes the TTCN freeze date associated with a release as the "end date" for that release.  (*Id.* at 83:1–6; PX2206.)

[FF26]          Corrections are made to standards specifications even after all deadlines and freeze dates.  (Dkt. No. 509 at 82:13–18, 83:22–84:18.)

[FF27]          The vast majority of ETSI participants disclose their intellectual property rights after both the Stage 3 and the TTCN freeze dates.  (Dkt. No. 521 at 122:10–123:7, 124:1–125:9.)  ETSI maintains a database that includes data about this consistent disclosure of IPR by participants after the freeze dates.  (*Id.* at 123:17–25, 126:13–20.)  Despite the prevalent practice of disclosure of IPR after the freeze dates, ETSI has not changed its policy to require disclosure at a different time.  (*Id.* at 51:20–52:1, 126:13–20, 135:10–136:22; PX1838; PX1812.)

### c.  The Patents-in-Suit

#### 1.  U.S. Patent No. 8,019,332

[FF20]          U.S. Patent No. 8,019,332 (the "'332 Patent"), titled "Method for Transmitting and Receiving Control Information through PDCCH," issued on September 13, 2011.  (Dkt. No. 26 ¶ 14; PX0002.)  The '332 Patent was originally owned by LG Electronics, which assigned the patent to Optis Cellular.  (DTX-0024.)

[FF21]          The '332 Patent lists Dae Won Lee, Ki Jun Kim, Dong Wook Roh, Yu Jin Noh, Joon Kui Ahn, and Jung Hoon Lee as inventors and LG Electronics Inc. ("LG") as the assignee.  (DTX-0024 at 1.)  The '332 Patent claims priority to Provisional Application No. 61/037,000, which LG filed on March 17, 2008.  (*Id.*; DTX-0997 at 1, 10.)

[FF22]          The '332 Patent application states that the "related technical field" is "LTE."  (*Id.*; Dkt. No. 508 at 42:12–43:13.)  The application also states that the "organization for

11

# Appx117

standardization" is "3GPP TSG RAN WG1" and that the "conference scheduled for presentation is "3GPP TSG RAN WG1 #52bis."  (DTX-0997 at 10; Dkt. No. 508 at 42:12–43:13.)

[FF23]	LG representatives presented several technical proposals to 3GPP related to the technical solutions described in the '332 Patent family. For example, LG submitted proposal R1-081567, "Randomization Function for PDCCH Search Space."  (DTX-0994; Dkt. No. 508 at 42:12–43:13; DTX-0776 at 29; DTX-2053A at 32.)

[FF24]	LG disclosed the '332 Patent family to ETSI on March 12, 2009. (DTX-0033 at 16–17; Dkt. No. 508 at 42:12–43:13; Dkt. No. 502 at 32:25–33:12; PX1791 at 1, 2, 16–17.)

### 2.   U.S. Patent No. 8,385,284

[FF25]	U.S. Patent No. 8,385,284 (the "'284 Patent"), titled "Control Channel Signaling Using a Common Signaling Field for Transport Format and Redundancy Version," issued on February 26, 2013. (Dkt. No. 26 ¶ 15; PX0003.)  The '284 Patent was originally owned by Panasonic, which assigned the patent to Optis Wireless.  (PX5265.)

[FF26]	The '284 Patent lists Christian Wengerter, Akihiko Nishio, Hidetoshi Suzuki, Joachim Loehr, and Katsuhiko Hiramatsu as inventors and Panasonic Corporation ("Panasonic") as the assignee.  (DTX-0026 at 1.)  The '284 Patent claims priority to EP07024829, which was filed on December 20, 2007.  (*Id.*; PX1846; Dkt. No. 501 at 11:24–25.)

[FF27]	Panasonic was a member of ETSI during the development of the LTE standard.  (Dkt. No. 508 at 28:10–13.)  The earliest-filed application in the '284 Patent family explicitly describes "3GPP specific exemplary embodiments."  (PX1846 at 46.)  The application states that "the concept of the invention may be . . . readily used in the LTE RAN currently discussed by the 3GPP."  (*Id.*; Dkt. No. 508 at 39:21–41:6.)

# Appx118

[FF28]      Panasonic representatives presented several technical proposals to 3GPP related to the technical solutions described in the '284 Patent family. For example, Panasonic disclosed R1-080129, "Joint Transport Format and RV Signaling on PDCCH Uplink Assignments."   (PX1990; DTX-0934.)   Panasonic representatives also submitted proposal R1-080591, "Joint Transport Format and Redundancy Version Signaling with Explicit NDI." (PX1743; Dkt. No. 508 at 39:21–41:6; DTX-2053A at 37.)  Additionally, Mr. Wengerter, a named inventor of the '284 Patent, presented proposal R1-080973, "Joint Transport Format and Redundancy Version Signaling with Explicit NDI."  (Dkt. No. 508 at 39:21–41:6; DTX-0120; DTX-0121 at 19; DTX-2053A at 6–7.)

[FF29]      Panasonic declared the '284 Patent family to ETSI on October 25, 2010, when it declared EP07024829 essential to technical specifications 3GPP TS 36.211, 3GPP TS 36.212, and 3GPP TS 36.213.  (DTX-0036 at 8; Dkt. No. 508 at 39:21–41:6.)

### 3.   U.S. Patent No. 8,411,557

[FF30]      U.S. Patent No. 8,411,557 (the "'557 Patent"), titled "Mobile Station Apparatus and Random Access Method," issued on April 2, 2013.  (Dkt. No. 26 ¶ 16; PX0004.) The '557 Patent was originally owned by Panasonic, which assigned the patent to Optis Wireless. (PX5265.)

[FF31]      The '557 Patent lists Daichi Imamura, Sadaki Futagi, Atsushi Matsumoto, Takashi Iwai, and Tomofumi Takata as inventors and Panasonic Corporation as the assignee. (DTX-0027 at 1.)  The '557 Patent claims priority to JP 2006-076995, which Panasonic filed on March 20, 2006.  (*Id*.; DTX-1648 at 1–2.)  The earliest filed application explicitly states that the technology is related to the Random Access Channel in "3GPP RAN LTE (Long Term Evolution)."  (DTX-1648 at 6; Dkt. No. 508 at 41:7–42:11.)

13

## Appx119

[FF32]     Panasonic representatives presented several technical proposals to 3GPP related to the technical solutions described in the '557 Patent family. For example, Panasonic submitted proposal R1-060792, "Random access burst evaluation in E-UTRA uplink," to the 3GPP Working Group on the radio access network during the March 27–31, 2006 meeting.  (DTX-0211; Dkt. No. 508 at 41:7–42:11; DTX-0313 at 39; DTX-2053A at 23.)

[FF33]     Panasonic disclosed the '557 Patent family to ETSI on March 16, 2010, when it declared Appl. No. 12/293,530 essential to 3GPP TS 36.321, 3GPP TS 36.211, and 3GPP TS 36.331.  (DTX-0035 at 6–7; Dkt. No. 508 at 41:7–42:11; PX1009 at 1, 2, 6–7.)

#### 4.   U.S. Patent No. 9,001,774

[FF34]     U.S. Patent No. 9,001,774 (the "'774 Patent"), titled "System and Method for Channel Estimation in a Delay Diversity Wireless Communication System," issued on April 7, 2015.  (Dkt. No. 26 ¶ 17; PX0005.)  The '774 Patent was originally owned by Samsung Electronics Co., Ltd. ("Samsung"), which assigned the patent to UPIL.  (PX5262.)

[FF35]     The '774 Patent lists Farooq Khan as the inventor and Samsung as the assignee.  (DTX-0028 at 1.)  The '774 Patent claims priority to Provisional Application No. 60/673,574, Provisional Application No. 60/673,674, and Provisional Application No. 60/679,026. (*Id.*)

[FF36]     Samsung representatives presented technical proposals to 3GPP related to the technical solution described by the '774 Patent family, including submitting proposal R1-050889, "UPC-MIMO: MIMO for Long Term Evolution."  (DTX-1088; DTX-0320 at 43, 55; Dkt. No. 508 at 43:14–45:8.)

14

# Appx120

[FF37]        Provisional Application 60/673,574 stated that there was an "anticipated disclosure to a standards body or committee" and that the alleged invention would be disclosed to "3GPP TSG RAN WG#1" on May 9, 2005.  (DTX-1058 at 1, 3–4.)

[FF38]        Provisional Application 60/679,026, filed May 9, 2005, states that "[i]f the proposal is adopted in the standards, Samsung will benefit from collecting royalty and/or cross-licensing from the patent."  (DTX-1000 at 16.)

[FF39]        Samsung disclosed the '774 Patent family to ETSI on December 30, 2008, when it declared Application Number 11/390,125 essential to 3GPP TS 36.211.  (DTX-0032; Dkt. No. 508 at 43:14–45:8; PX1893.)

### 5.   U.S. Patent No. 8,102,833

[FF40]        U.S. Patent No. 8,102,833 (the "'833 Patent"), titled "Method for Transmitting Uplink Signals," issued on January 24, 2012.   (Dkt. No. 26 ¶ 18; PX0006.)  The '833 Patent was originally owned by LG, which assigned the patent to Optis Cellular.  (PX5263.)

[FF41]        The '833 Patent lists Dae Won Lee, Bong Hoe Kim, Young Woo Yun, Ki Jun Kim, Dong Wook Roh, Hak Seong Kim, and Hyun Wook Park as inventors and LG Electronics Inc. as the assignee.  (DTX-0025 at 1.)  The '833 Patent claims priority to Provisional Application No. 60/972,244, which LG filed on September 13, 2007.  (*Id.*; DTX-0617.)

[FF42]        LG representatives presented technical proposals to 3GPP related to the technical solution described by the '833 Patent family, including submitting proposal R1-080267, "PUSCH Multiplexing of Data, Control, and ACK/NACK Information."  (DTX-0430; DTX-0934 at 28; DTX-2053A at 33–34.)

15

# Appx121

[FF43]        LG disclosed the '833 Patent family to ETSI on March 12, 2009, when it declared the application of the '833 Patent essential to 3GPP TS 36.211.  (DTX-0034 at 17; Dkt. No. 508 at 45:9–46:14; PX1791 at 1, 2, 17.)

[FF44]        Optis asserts that the '332 Patent, the '284 Patent, the '557 Patent, the '774 Patent, and the '833 Patent (collectively, the "Asserted Patents") are essential to LTE and are infringed by Apple's practice of the LTE standard.  (Dkt. No. 26.)

## II.    CONCLUSIONS OF LAW ("CL")

### a.    The Court Declines Jurisdiction to Decide Whether Plaintiffs' Offers were Consistent with FRAND.

#### 1. Subject Matter Jurisdiction

[CL1]        A court has subject matter jurisdiction to issue a declaratory judgment if "there is a justiciable case or controversy."  *MedImmune, Inc.  v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007); *see also* 28 U.S.C. § 2201.  A controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Genentech*, 549 U.S. at 127.  A court cannot issue a declaratory judgment to render an advisory opinion on "what the law would be upon a hypothetical set of facts."  *Id.* (internal citation omitted).

[CL2]        The Court has a continuing obligation to examine the basis of its jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3).  "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

## Appx122

### 2. The Court Has Not Been Presented with Any Evidence by Which it Can Adjudicate whether Optis's Offer was FRAND as to U.S. Patents Only.

[CL3]     Optis's Count VIII requests a declaratory judgment that it has not breached its contractual FRAND obligations.  The Court previously dismissed Optis's Count VIII as to foreign patents, which limits its request for declaratory judgment on FRAND compliance to only U.S. patents.  (Dkt. No. 102; *see supra*.)

[CL4]     The Court, however, has not been presented with sufficient evidence by which it can adjudicate whether Optis's offers were FRAND as to U.S. Patents only.  Optis never made an offer specifically for or limited to its U.S. Patents.  Rather, during negotiations with Apple, Optis consistently and only made offers for a global license, at a global rate. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ During negotiations, Optis never tendered an offer to Apple for a license limited to its U.S. patents.  ████████████████████

[CL5]     At trial, Optis presented what it purported to be a U.S.-only rate by simply applying a "2x uplift" to their previously proposed global rate.  (Dkt. No. 508 at 103:19–22 ("Q. And what further adjustment did you make?  A. So I made a further adjustment for a U.S.-only rate by applying the two times uplift that Justice Birss used.").)  This rate merely extracted the global rate from Optis's final rate calculation and applied a factor of two increase.  The Court was presented with no meaningful analysis that supported this extraction.  Therefore, based on the evidence presented at trial, Optis has not actually made any offer to Apple for only its U.S. patents.

[CL6]     Optis argues that its methodology for extracting a U.S.-only-rate from its proposed global rate—as well as its general methodology for its proposed rates—was taken from

17

# Appx123

Justice Birss's decision in the *Unwired Planet* case in the UK.[1] (Dkt. No. 508 at 92:1–93:11; Dkt. No. 509 at 9:1–5, 9:15–19, 9:25–10:4, 10:15–11:24, 12:20–13:1, 15:11–16:6, 17:1–18:3, 20:14–20, 20:25–23:7, 103:12–16; DTX-0004 at 1; DTX-0686 at 1; DTX-1092 at 1, 2–14.)

[CL7]        This Court is neither constrained nor persuaded by Optis's attempted reliance on the *Unwired Planet* case or the methodology it sets out.  Optis's *post hoc* slight of hand as to a US-only rate are insufficient to constitute anything more than "a hypothetical set of facts." *Genentech*, 549 U.S. at 127.  Optis's Count VIII, as it stands in the wake of the Court's direction in its Order dismissing "any portion of Count VIII that seeks a declaration that Plaintiffs have complied with their obligations under foreign laws or as they relate to foreign patents,"  asks the Court to issue a declaration as to whether Optis has complied with their FRAND obligations as to U.S. patents.  (Dkt. No. 102 at 6.)  Since Optis has not presented evidence that it made any offer to Apple for U.S.-only patents, the Court simply cannot determine whether Optis complied with its FRAND obligations as to their U.S. SEPs and Apple.  Any declaration by the Court would amount to merely an advisory opinion, which is disfavored.  Accordingly, the Court declines to issue the declaratory judgment that Optis requests in Count VIII as a matter of discretion.  *See Medimmune*, 549 U.S. at 136 (holding that the Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.").

### 3. No FRAND Defense was Raised.

[CL8]        By failing to raise a commensurate counterclaim or affirmative defense, Apple has waived its ability to challenge the jury verdict as inconsistent with Optis's FRAND

---

[1] In the cited case, Justice Birss adopted a methodology—subsequently affirmed by the Supreme Court of the United Kingdom—to value a portfolio of patents declared to be standards-essential by using different methods that account for actual essentiality, major market rates, and the structure of a license that would be preferred by the parties.  *Unwired Planet Int'l Ltd. v. Huawei Techs. combined with Huawei Techs. and ZTE Corp. v. Conversant Wireless Licensing* (2020) UKSC 37, at ¶¶ 42–48.

# Appx124

obligations.

[CL9]     Though readily available at multiple times in this case, Apple failed to raise any counterclaim as to Optis's FRAND obligations.  A counterclaim is compulsory when it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a)(1)(A).  "[A] party that does not assert its compulsory counterclaim in the first proceeding has waived its right to bring the counterclaim and is forever barred from asserting that claim in future litigation."  *Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc*., 347 F.3d 935, 938 (Fed. Cir. 2003).  A party "cannot avoid a declaratory action by refusing to file the counterclaim."  *Capo, Inc. v. Dioptics Med. Prods., Inc*., 387 F.3d 1352, 1356 (Fed. Cir. 2004) ("In an action for declaration of noninfringement, a counterclaim for patent infringement is compulsory and if not made is deemed waived. (internal citation omitted)).

[CL10]     Additionally, Apple failed to raise any affirmative defense as to Optis's FRAND obligations.  Federal Rule of Civil Procedure 8(c)(1) identifies "license," "release," and "waiver" as affirmative defenses.  To the extent that Apple maintains that FRAND places an additional contractual limitation on damages[2] beyond the instructions that the Court provided the jury, Apple should have properly raised that defensive issue and asked the Court for instructions to the jury consistent with that issue.  They did not.  *See DH Tech., Inc. v. Synergystex Intern., Inc.*, 154 F.3d 1333, 1344 (Fed. Cir. 1998) (affirming that accused infringer could not assert the

---

[2] Any claim by Apple as to the protection of the FRAND commitment by Optis and its predecessors would require affirmative findings, including whether ETSI and Samsung, LG, and Panasonic intended for Apple to be a third-party beneficiary to the FRAND commitment. *Cf. First Bank  v. Brumitt,* 519 S.W.3d 95, 102 (Tex. 2017) ("An exception to this general rule" that only a party to a contract can sue for breach "permits a person who is not a party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary."); *TCT Mobile Europe, et al. v. Koninklijke Philips NV*, 19/02085, 352J-W-B7D-CPCIX (Civil Court of Paris) (Feb. 6, 2020) (noting that a FRAND commitment *may* be viewed as a "stipulation pour autrui," a French law covenant benefiting a third party that could be enforced by the third party.).  Without any affirmative claim for relief by Apple, neither the Court nor the jury performed any analysis as to the issues undergirding the FRAND commitment.

19

# Appx125

affirmative defense of implied license because it failed to plead it in the responsive pleading or timely raise it); *see also Wood v. Milyard*, 566 U.S. 463, 470 (2012) ("in civil litigation, [an affirmative defense] is forfeited if not raised in a defendant's answer or in an amendment thereto.").

[CL11]     Notably, Apple failed to raise any FRAND issue with the Court at the pretrial conference (Dkt. No. 435 at 64:20) or at the charge conference.  (Dkt. No. 499.)

[CL12]     As a consequence of Apple's failure to seek affirmative FRAND relief, the only constraints of any FRAND obligation which were affirmatively presented in this case appeared via Optis's Count VIII.  Relying on representations by the parties,[3] the Court ruled that Count VIII—and corresponding FRAND issues—would be tried to the bench.[4]  (Dkt. No. 435 at

---

[3] *See, e.g.,* Dkt. No. 360 at 4 ("The issues to be tried to the Court in a bench trial immediately following the jury trial include . . . Plaintiffs' claim for a declaratory judgment . . ."), 18 ("Plaintiffs here seek only a declaration that they have complied with their FRAND obligations and Apple has forfeited any FRAND defense.  Plaintiffs may not parse apart this claim and attempt to have some portions tried to the Court and some portions tried to the jury.  Their claim goes to the Court in its entirety."); Dkt. No. 435 at 54:12–16 ("Your Honor, the issue of bad faith would only be tried to the jury if Apple said we're required to make a FRAND damages request and that our request is not FRAND damages.  Other than that, it would not be tried to a jury.  It'd be tried to the bench."), 54:17–55:3 ("Q: When you filed your most recently amended complaint, you inserted Count 8 that sought declaratory relief to find that Optis had complied with its FRAND obligation and that Apple had acted in bad faith and engaged in holdout.  You sought a declaratory judgment to that effect.  Did you then at the time of that amendment intend to try that issue to the jury or to the bench? A: No, you Honor, it was [Plaintiffs'] expectation that we try it to the bench.").

[4] Although present and before the Court, Apple failed to object to this ruling.  While the Court can only speculate as to Apple's motivation for its failure to seek to put FRAND issues in front of the jury, it is worth noting that Optis's Count VIII intertwined Optis's own purported FRAND compliance with various allegations of bad acts and bad faith by Apple.  Optis itself noted that "the issue of bad faith would only be tried to the jury if Apple said [Optis was] required to make a FRAND damages request and that [Optis's] request is not FRAND damages.  Other than that, it would not be tried to a jury.  It'd be tried to the bench." (Dkt. No. 435 at 54:12–16.)  By acquiescing in Optis's request that Count VIII be tried to the bench, the serious allegations of bad faith or holdout by Apple would not be presented to the jury.  (*Id.* at 56:25–57:4, 62:8–13.)  Apple's strategic silence at this juncture effectively shielded them from any bad faith evidence being presented to the jury. In light of their silence and failure to oppose Optis's bench trial request, it would be a particularly unfair, given the jury's verdict for Optis, for Apple to now argue that FRAND issues should have been presented to the jury.

20

**Appx126**

56:25–57:9; Dkt. No. 437 at 20:23–21:2.)  Having failed to plead any FRAND counterclaim or defense, Apple foreclosed itself from any relief on the basis of the FRAND obligation.[5]

[CL13]        Indeed, Apple's inability to later raise a FRAND defense to challenge the accepted verdict is akin to an implementer's inability to later challenge a consummated license as inconsistent with FRAND.  *See, e.g.*, *BNA, Patents and Standards: Practice, Policy, and Enforcement* at 11.II.D (noting that "an implementer should not assume that it can both execute a license on agreed terms and then file suit to challenge those terms as inconsistent with the FRAND obligation"); *see also See Unwired Planet Int'l v. Huawei Techs.*, [2017] EWHC (Pat) 711, [155] (UK) ("[T]here is no reason why the [ETSI FRAND] undertaking should entitle either party subsequently to challenge agreed terms as being non-FRAND absent competition law considerations.")

### b.    Apple Has Failed to Show the Asserted Patents are Unenforceable Due to Late Disclosure to ETSI.

#### 1. Legal Standard

[CL14]        "To support a finding of implied waiver in the standard setting organization context, the accused must show by clear and convincing evidence that '[the patentee's] conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.'" *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011); *see also Core Wireless Licensing S.A.R.L. v. Apple, Inc.*, 899 F.3d 1356, 1365 (Fed. Cir. 2018) (holding that implied waiver requires a showing that "the patentee's conduct was so inconsistent with an intent to enforce its right as to induce a reasonable belief that such right has been relinquished.").

---

[5] Having silently watched the parade pass it by, Apple cannot now complain that the parade didn't stop on its own to entertain them.

# Appx127

[CL15]        In *Core Wireless*, the Federal Circuit observed that "[a] participant in a standards-setting organization may waive its right to assert infringement claims against products that practice the standard."  *Core Wireless*, 899 F.3d at 1365 (citing *Hynix*, 645 F.3d at 1347–48). "Such conduct can be shown where (1) the patentee had a duty of disclosure to the standard setting organization, and (2) the patentee breached that duty."  *Id.* (citing *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020–24 (Fed. Cir. 2008).

[CL16]        That the patentee had a duty of disclosure and that they breached that duty must be shown by the accused infringer by clear and convincing evidence.  *Conversant Wireless Licensing S.A.R.L. v. Apple, Inc.*, 2019 WL 4038419, at *2 (N.D. Cal. May 10, 2019).  Further:

> Because implied waiver is an equitable defense, however, the doctrine "may only be applied in instances where the patentee's misconduct resulted in [an] unfair benefit." *Core Wireless*, 899 F.3d at 1368 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)). Alternatively, implied waiver may also be found in cases of "egregious misconduct sufficient to justify the sanction of unenforceability of the patent at issue." *Id*.

*Id.*

### 2. There is No Clear and Convincing Evidence that the Original Patent Owners Breached Their Duty to Disclose Their Intellectual Property Rights.

[CL17]        Apple has failed to show, by clear and convincing evidence, that the original patent owners' "conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Hynix*, 645 F.3d at 1348.  Since Apple has not shown that LG, Panasonic, and Samsung breached their duties of disclosure by clear and convincing evidence, waiver does not apply to the Asserted Patents.

[CL18]        The Court must first "determine whether the written IPR policies [of ETSI] impose any disclosure obligations on participants." *Qualcomm*, 548 F.3d at 1012.  Here, the ETSI IPR Policy imposes a duty to disclose IPR in Clause 4.1 by requiring that "each MEMBER shall

22

# Appx128

use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion" and that "a MEMBER submitted a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." (DTX-0068 at § 4.1.) The original owners of the patents at issue—Panasonic, LG, and Samsung—were members of ETSI when they owned these patents and incurred the obligation to disclose them. (Dkt. No. 508 at 28:10–13; *see supra*.)

[CL19]     Having determined there was a duty to disclose the IPR, the Court must then determine whether the patentees breached their duty of disclosure. *Core Wireless*, 899 F.3d at 1365. There has been no presentation by clear and convincing evidence that the patent owners breached their duty to disclose their intellectual property rights to the SSOs. Rather, the evidence shows that all asserted patent families were disclosed to ETSI. (*See supra*.)

[CL20]     The ETSI IPR Policy specifies that the duty of the patentee is "to inform ETSI of ESSENTIAL IPRs *in a **timely** fashion*." (DTX-0068 at § 4.1. (emphasis added).) The parties dispute what constitutes a timely disclosure, and each side submitted competing evidence supporting different "freeze dates" as the purported deadline by which disclosure should have been made. (*See supra*.)

[CL21]     The ETSI IPR Guide elaborates that "[m]embers are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential." (DTX-1640 at 7–8.)

[CL22]     The Guide explains that "[i]ntentional non-disclosure of EIPR generally occurs in two instances: 1) when a representative participating in a Technical Body on behalf of a

23

**Appx129**

Member has actual knowledge of EIPR, and yet the Member holds back notification; or, 2) when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations." (*Id.* at 17.) Apple presented no evidence that either the original patent owners held back notification to ETSI, nor that the original patent owners fostered an atmosphere of ignorance. Rather, Apple's allegation is that because Panasonic, LG, and Samsung did not disclose their IPR by the Stage 3 Freeze Date, it was, *ipso facto*, disclosed untimely.

[CL23]    The understanding of ETSI participants as to the meaning of the IPR disclosure policies may inform the waiver analysis.[6] *Qualcomm*, 548 F.3d at 1012 (explaining that "[t]he existence of a disclosure duty is a legal question with factual underpinnings," including standard-setting organization "participants' understanding of the meaning of the [SSO] IPR policies" (citing *Rambus Inc. v. Infineon Tech. Ag*, 318 F.3d 1081, 1087 n.3 (Fed. Cir. 2003).)

[CL24]    ETSI participants do not understand the organization's IPR Policy to require disclosure before the freeze dates. The vast majority of ETSI participants disclose their intellectual property rights after both the Stage 3 and the TTCN freeze dates. (Dkt. No. 521 at 122:10–123:7, 124:1–125:9.) For example, 94% of all ETSI declarations for Release 8 came after the TTCN

---

[6] This is also true under French law. Optis' French law expert Professor Borghetti has explained that custom in the industry and course of dealing are relevant tools for interpreting language in French contracts. Borghetti Reb. Rep. ¶ 32 ("It is undisputed in French law that elements beyond the four corners of the contract, such as the behavior or course of dealing of the parties, can be used to shed light on the parties' intention, and thus to interpret the contract.").

Professor Borghetti has also explained that, under French law, "[c]lear and unambiguous terms are not subject to interpretation as doing so risks their distortion." Borghetti Opening R. ¶ 16. The Court finds that the ETSI IPR Policy is not clear and unambiguous as to the timing of its disclosure requirement, and thus an analysis of the course of dealing in the industry is appropriate. Such an analysis is necessary to comply with the "basic rule of contractual interpretation under French law" that "[a] contract is to be interpreted according to the common intention of the parties rather than stopping at the literal meaning of its terms." Borghetti Op. Rep. ¶ 17 (quoting article 1188 § 1 *code civil*).

**Appx130**

freeze date of March 12, 2009; and 96.8% of all ETSI declarations for Release 8 came after the "Stage 3 freeze date." (Dkt. 521 at 124:1-20.)   ETSI is aware of this practice of disclosure and there is no evidence it has taken any action to encourage or enforce earlier disclosure. (*Id.* at 123:17–25, 126:13–20.)

[CL25]        The Court finds no clear and convincing evidence that Optis has breached its duty to disclose its essential IPR to ETSI; rather, the evidence indicates that Optis and its predecessors-in-interest in the applicable patents timely disclosed their IPR to ETSI in a manner consistent with the SSO's procedures.

### 3. Apple Has Not Shown Egregious Misconduct Sufficient to Justify the Sanction of Unenforceability.

[CL26]        Alternative to the structure above, "implied waiver may also be found in cases of egregious misconduct sufficient to justify the sanction of unenforceability of the patent at issue." *Conversant Wireless*, 2019 WL 4038419, at *2 (citing *Core Wireless*, 899 F.3d at 1368).

[CL27]        Egregiousness is a very high bar, typically saved for only such affirmative acts as "perjury, the manufacture of false evidence, and the suppression of evidence." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (collecting cases).

[CL28]        As explained *supra*, the patentees did not breach a duty to ETSI.  As a result, the Court finds that they have not acted with such egregious misconduct as to justify a finding of unenforceability.

## V.        CONCLUSION

In light of the foregoing the Court: declines to issue a declaratory judgment as to Count VIII of Optis's Amended Complaint (Dkt. No. 26); finds Apple's failure to earlier raise a FRAND defense results in a waiver of its ability to do so at this late date; finds that assertion of the Asserted

25

**Appx131**

Patents were not waived by untimely disclosure; and finds the sanction of unenforceability is not warranted.

**So ORDERED and SIGNED this 22nd day of January, 2021.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

26

**Appx132**